COMMERCIAL UNION INSURANCE COMPANY v MEDICAL
PROTECTIVE COMPANY

Docket No. 74912. Argued January 15, 1986 (Calendar No. 16).
Decided September 17, 1986.

Commercial Union Insurance Company, an excess insurer, brought an action in the Wayne Circuit Court against Medical Protective Company, a primary insurer, alleging negligence and bad faith in failing to defend or settle a medical malpractice claim against a common insured, and seeking to recover monies paid on behalf of the insured. The court, Theodore R. Bohn, J., granted summary judgment for the defendant, holding that the plaintiff had no direct cause of action against the defendant because the defendant's duty to act in good faith ran to the insured and not to the plaintiff, and that the plaintiff was estopped from maintaining its claim as the subrogee of its insured because of its participation in the settlement of the claim. The Court of Appeals, BRONSON, P.J., and SHEPHERD and SWALLOW, JJ., reversed, holding that the defendant had a duty to act in good faith toward the plaintiff and the plaintiff could claim breach of the duty directly or as equitable subrogee of the insured, and that summary judgment was improper because factual questions had been raised (Docket No. 66538). The defendant appeals.

In opinions by Chief Justice WILLIAMS, joined by Justices CAVANAGH and ARCHER, and by Justice BOYLE, joined by Justices LEVIN, BRICKLEY, and RILEY, the Supreme Court held:

In this case, the primary carrier did not owe a direct duty to the excess carrier to act in good faith to defend or settle the claim against the common insured. The excess insurer's cause

REFERENCES

Am Jur 2d, Insurance §§ 1789, 1791-1793, 1794 et seq.

Liability insurance: excess carrier's right of action against primary carrier for improper or inadequate defense of claim. 49 ALR4th 304.

Reinsurer's liability for primary liability insurer's failure to compromise or settle. 42 ALR4th 1130.

Excess carrier's right to maintain action against primary liability insurer for wrongful failure to settle claim against insured. 10 ALR4th 879.

of action against the primary insurer is as equitable subrogee of the insured.

Chief Justice WILLIAMS, joined by Justices CAVANAGH and ARCHER, would hold that an excess insurer may sue a primary insurer as the equitable subrogee of an insured for the primary insurer's bad-faith failure to defend or settle a claim within policy limits.

1. An insurer is liable to its insured for a judgment exceeding policy limits when the insurer, who has exclusive control of defending and settling a claim, refuses in bad faith to defend the claim or to settle it within policy limits. The cause of action originates in the implied covenant of good faith and fair dealing which arises from the contract between the insurer and the insured. While no such contract exists between a primary and excess insurer, a majority of courts have recognized a cause of action by an excess insurer against a primary insurer for bad-faith failure to settle or defend a claim against a common insured on the basis of equitable subrogation.

2. Where an insured does not carry excess insurance, the insured can become liable for any judgment exceeding primary coverage limits and, thus, has every incentive to enforce a primary insurer's contractual duty to defend or attempt to settle a claim in good faith within policy limits. Where an insured carries excess liability insurance, however, the incentive dissolves because the excess carrier and not the insured would bear the injury resulting from a primary insurer's breach. Therefore, an excess insurer, as equitable subrogee of the insured, may maintain a cause of action against a primary insurer for the primary insurer's bad-faith failure to defend or settle a claim within policy limits.

3. In this case, the primary carrier did not owe a direct duty to the excess carrier to act in good faith to defend and settle a claim within the policy limits of the primary carrier. If the excess carrier is to proceed against the primary carrier, it must do so as the subrogee of the insured.

4. The trial court improperly granted the defendant's motion for summary judgment because the plaintiff's complaint sufficiently alleged a claim upon which relief could be granted. As the equitable subrogee of the insured, the plaintiff can claim damages for injuries resulting from the defendant's alleged failure to defend and settle in good faith or with due care; material issues of fact exist as to whether the defendant acted in good faith, whether the defendant reasonably relied on the plaintiff's participation in the final settlement, and whether the insured failed to coöperate.

Justice BOYLE, joined by Justices LEVIN, BRICKLEY, and RILEY,

agreed that in this case the excess insurer's cause of action against the primary insurer is as equitable subrogee of the insured, that there is no direct duty between the primary and excess insurers, and that summary disposition was improper, but wrote separately to note that no convincing legal precedent or reasoning and no policy considerations were here presented which would lead to a determination that traditional tort doctrine should be expanded to recognize such a direct duty.

Affirmed in part, reversed in part, and remanded.

136 Mich App 412; 346 NW2d 648 (1984) affirmed in part and reversed in part.

1. INSURANCE — SUBROGATION — EXCESS INSURERS — PRIMARY INSURERS.

A primary insurer did not owe a direct duty to an excess insurer to act in good faith to defend or settle a claim against a common insured; the excess insurer's cause of action against the primary insurer for loss as a result of the primary insurer's failure to so act was as equitable subrogee of the insured.

2. INSURANCE — SUBROGATION — EXCESS INSURERS — PRIMARY INSURERS.

*An excess insurer may sue a primary insurer as the equitable subrogee of an insured for the primary insurer's bad-faith failure to defend or settle a claim within policy limits.*

3. INSURANCE — FAILURE TO SETTLE — BAD FAITH.

*An insurer is liable to its insured for a judgment which exceeds policy limits where the insurer, in bad faith, refuses to settle a claim within policy limits.*

*MacArthur, Cheatham, Acker & Smith, P.C.* (by *Brian J. Doren* and *James G. Gross*), for the plaintiff.

*Moll, Desenberg, Bayer & Behrendt* (by *Jon P. Desenberg* and *David J. Franks*) for the defendant.

WILLIAMS, C.J. The issue in this case is whether an excess insurer has a cause of action against a primary insurer for the latter's failure to defend or settle a liability claim in good faith. Courts have recognized such a cause of action under at least two theories: 1) the primary insurer owes a

duty to act in good faith toward its insured, and the excess insurer is equitably subrogated to the position of the insured, and 2) the primary insurer owes a duty to act with due care and in good faith directly toward the excess insurer. We join many other jurisdictions by adopting the first theory and holding that an excess insurer may sue a primary insurer as the equitable subrogee of the insured. We would decline to hold at this time that a primary insurer owes a tort duty to act in good faith and with due care directly to the excess insurer.

## I. FACTS

In 1974, Elaine Smith and her husband sued Merle Berman, M.D., and Cottage Hospital for damages which allegedly resulted from Dr. Berman's negligent administration of spinal anesthetic. Mrs. Smith alleged that Dr. Berman's negligence caused a right foot drop, constant right leg pain, psychiatric problems, and a neurogenic bladder requiring regular self-catheterization.

The Medical Protective Company (MP) insured Dr. Berman with primary professional liability insurance up to $200,000, and the Commercial Union Insurance Company (CU) insured him with excess professional liability insurance up to $1,000,000. Under the terms of the primary policy, MP controlled Dr. Berman's defense in the malpractice action. MP hired attorney Lee Wulfmeier to represent Dr. Berman.

In September, 1975, the Smiths sent interrogatories to Wulfmeier, who forwarded them to Berman. Berman apparently refused to answer after Wulfmeier urged him twice by letter to respond. Berman's failure to comply with a court order compelling answers to the interrogatories resulted

in a default judgment being entered against him on May 25, 1978.

Soon thereafter, Wulfmeier informed MP that the default judgment had entered and that Berman had retained private counsel, who had supplied Wulfmeier with answers to the interrogatories. The remainder of the letter states:

> I have spoken with [the Smiths' attorney] who has indicated he would not set aside the default, voluntarily, but would not necessarily oppose it if indeed we tried to set it aside. We are in that *tender position* of *having the matter defaulted although our defense to same is lack of cooperation* and therefore *I believe we would not have to forward monies to the stp* [sic] *if indeed they went forward with collection.* This is again a complicated situation and one that nessitates [sic] your thinking and attention, almost immediately. I would be more than happy to discuss this matter with you and also have a conference call with Dr. Berman's personal attorney if you deem that necessary. [Emphasis added.]

Another letter from Wulfmeier to MP, dated July 12, 1978, enclosed a draft "reservation of rights" letter to be forwarded to Berman. This letter indicated MP's intent to refuse to pay damages on any award entered in the case because of Berman's failure to coöperate in the defense. The draft letter also notified Berman that he must have his own counsel seek to set aside the default judgment. In a third letter to MP, sent one week before the parties were to go to trial on the question of damages, Wulfmeier assessed the case as follows:

> I believe *this is a very bad case, and presents us with very little defense* in light of Dr. Gibbs' testimony. He is absolutely convinced that this

injection was given into the conus and that is the reason for all of the problems that this lady has, which obviously are well-documented in the records. The hospital has indicated that they would pay $25,000.00 of a total $200,000.00 settlement, and *unfortunately we did not jump on this some time ago when we could probably have paid only $100,000.00.* I would appreciate your thoughts as to *whether or not you wish to spend $175,000.00 to resolve this potentially horrendous case.* [Emphasis added.]

Two other important events occurred in the late months of 1978, just prior to the trial date in January, 1979. In October, 1978, Berman died. On December 21, 1978, CU wrote to MP protesting MP's failure to attempt to have the default judgment set aside. Cu apparently suspected MP of deliberately allowing the default judgment to stand in order to avoid paying any judgment on the grounds of noncoöperation. In its letter to MP, CU stated:

With Dr. Berman in default, in my opinion the trial of the case will be limited to the issue of damages. In my further opinion it is very likely that damages will greatly exceed the sum of $200,000, your policy limit.

It is the position of [CU] that if this case proceeds to trial on the issue of damages and if those damages are in a sum in excess of $200,000 and if [CU] is called upon to pay any sum in excess of $200,000, that it will look to the Medical Protective Company and its agents for the recovery of such sums. It is [CU's] opinion that your actions in this case have clearly prejudiced it.

On the first day of trial, Wulfmeier unsuccessfully attempted to have the default judgment set aside. Settlement negotiations ensued between MP, CU, and Wulfmeier. The attorney representing CU stated that

it is the position of the . . . excess carrier that Medical Protective, by not offering its primary limits, is engaging in negotiations in bad faith, at least as far as we are concerned, and the circumstances of this litigation should be tendering its limits of Two Hundred Thousand Dollars toward any potential settlement. . . . It is the position of the excess carrier this case has a value of at least Two Hundred Thousand Dollars, no less than Two Hundred Thousand Dollars and under those circumstances, the limits of Medical Protective ought to be tendered to the excess carrier.

The attorney representing the Smiths stated that "[t]he plaintiffs never have been offered a nickel in this case."

The parties eventually entered into a settlement for $350,000. MP contributed $190,000, and Dr. Berman's estate contributed $10,000, toward MP's policy limit of $200,000. Cottage Hospital contributed $25,000, and CU contributed the remaining $125,000. The malpractice action was dismissed with prejudice on May 24, 1979.

CU filed the present action in March, 1980, alleging that "notwithstanding its duties and obligations . . . [MP] was guilty of negligence and bad faith . . . ."[1] The trial court granted MP's motion for summary judgment on two grounds: 1)

[1] Paragraph 8 of CU's complaint stated in full:

8. That notwithstanding its duties and obligations as aforesaid, the defendant, by its agents, employees, attorneys and representatives, was guilty of negligence and bad faith in the following particulars:

A. In permitting its insured Berman to go into default;

B. In failing to take any steps to set aside its insured's default until shortly before trial, at which time such attempt was unsuccessful;

C. In selecting counsel for its insured Berman and in instructing and allowing counsel to act contrary to the best interests of its insured;

D. In misrepresenting the extent of its coverage to Smiths' counsel;

CU had no direct cause of action against MP, and 2) CU was estopped from maintaining its claim as the subrogee of its insured because of its participation in the settlement of the claim.

The Court of Appeals reversed, holding that 1) MP had a duty to act in good faith toward CU, and CU could claim breach of this duty directly or as the equitable subrogee of the insured; and 2) summary judgment was improperly granted, because factual questions were raised regarding whether MP had acted in good faith, whether Berman's action amounted to noncoöperation, and whether MP reasonably relied on CU's participation in the settlement. *Commercial Union Ins Co v Medical Protective Co,* 136 Mich App 412; 356 NW2d 648 (1984). In an order entered June 26, 1985, we granted leave to appeal. 422 Mich 939.

## II. EQUITABLE SUBROGATION

This Court held long ago that an insurer is liable to its insured for a judgment exceeding policy limits when the insurer, who has exclusive control of defending and settling the suit, refuses to settle within policy limits in "bad faith." *City of Wakefield v Globe Indemnity Co,* 246 Mich 645, 648; 225 NW 643 (1929). This cause of action originates in the implied covenant of good faith and fair dealing which arises from the contract between the insurer and the insured. *Id.,* 650. Because no contract exists between a primary

E. In failing to reveal the extent of its coverage to Smiths' counsel;

F. In failing to settle or attempt to settle the *Smith v Berman* case within its policy limits;

G. In failing to timely attempt settlement within its policy limits;

H. In failing to tender its policy limits.

insurer and an excess insurer, courts have struggled to determine whether any sound theoretical basis exists for recognizing an excess insurer's cause of action against a primary insurer for failing to defend or settling in bad faith. A majority of courts recognize such a cause of action on the basis of equitable subrogation.

Equitable subrogation is a legal fiction through which a person who pays a debt for which another is primarily responsible is substituted or subrogated to all the rights and remedies of the other. It is well-established that the subrogee acquires no greater rights than those possessed by the subrogor, and that the subrogee may not be a "mere volunteer." *Smith v Sprague,* 244 Mich 577, 579-580; 222 NW 207 (1928); *Foremost Life Ins Co v Waters,* 88 Mich App 599, 603; 278 NW2d 688 (1979), rev'd on other grounds 415 Mich 303; 329 NW2d 688 (1982).

Where an insured does not carry excess insurance, the insured can become liable for any judgment exceeding primary coverage limits. Sutterfield, *Relationships between excess and primary insurors* [sic]: *The excess judgment problem,* 52 Ins Counsel J 638, 639 (1985). In such a situation, the insured has every incentive to enforce the primary insurer's contractual duty to defend or to attempt to settle within policy limits in good faith. Where, however, an insured carries excess coverage, that incentive dissolves. The excess carrier, and not the insured, bears the injury resulting from the primary insurer's breach, and is therefore the party with the greatest incentive to enforce the primary insurer's duties.

Numerous courts allow an excess insurer to maintain an action against a primary insurer for bad-faith failure to defend or settle within the latter's policy limits on the basis of the theory of

equitable subrogation. Sutterfield, *supra.* The theoretical basis for this action was succinctly stated by the Supreme Court of California:

> Since the insured would have been able to recover from the primary carrier for a judgment in excess of policy limits caused by the carrier's wrongful refusal to settle, the excess carrier, who discharged the insured's liability as a result of this tort, stands in the shoes of the insured and should be permitted to assert all claims against the primary carrier which the insured himself could have asserted. [*Commercial Union Assurance Cos v Safeway Stores,* 26 Cal 3d 912, 917-918; 164 Cal Rptr 709; 610 P2d 1038 (1980).]

Accord *Continental Casualty Co v Reserve Ins Co,* 307 Minn 5, 7-9; 238 NW2d 862 (1976); *North River Ins Co v St Paul Fire & Marine Ins Co,* 600 F2d 721, 723, n 3 (CA 8, 1979) (applying South Dakota law); *Ranger Ins Co v Travelers Indemnity Co,* 389 So 2d 272, 274-276 (Fla App, 1980); *Centennial Ins Co v Liberty Mutual Ins Co,* 62 Ohio St 2d 221, 223-224; 404 NE2d 759 (1980); *Portland General Electric Co v Pacific Indemnity Co,* 579 F2d 514, 515-516, n 2 (CA 9, 1978) (applying Oregon law); *Vencill v Continental Casualty Co,* 433 F Supp 1371, 1376 (SD W Va, 1977) (applying West Virginia law).[2]

Proponents of the equitable subrogation theory point out that allowing an excess insurer a cause of action does not increase the scope of the primary insurer's duty; nor does it increase the amount of liability, beyond that which the primary

[2] See also cases discussed in Smith, *The implied covenant of good faith and fair dealing as affecting equitable subrogation,* 1980 Ins Law J 378, Wall, *Bad faith, excess liability actions by or against excess insurers,* 48 Ins Counsel J 311 (1981), Sutterfield, *supra,* and Anno: *Excess carrier's right to maintain action against primary liability insurer for wrongful failure to settle claim against insured,* 10 ALR4th 879.

insurer owes its insured.[3] In addition, allowing the excess insurer to enforce the primary insurer's duty to settle in good faith serves the public and judicial interests in fair and reasonable settlement of lawsuits by discouraging primary carriers from "gambling" with the excess carrier's money when potential judgments approach the primary insurer's policy limits. Sutterfield, *supra,* 638, 642. Finally, the public interest in avoiding unnecessarily high insurance premiums is served by recognizing such a cause of action because, where the excess insurer is required to cover both primary and excess liability as a result of the primary insurer's breach of the duty to settle in good faith, policy rating structures are distorted, rendered uncertain, and made more expensive. *Valentine v Aetna Ins Co,* 564 F2d 292, 298 (CA 9, 1977) (applying California law, and approving suit by excess insurers against primary insurers under the doctrine of equitable subrogation). Sutterfield, *supra,* 640.

For all these reasons, we would hold that an excess insurer may maintain a cause of action against a primary insurer for the latter's bad-faith failure to defend or settle within policy limits. The excess insurer is equitably subrogated to the position of the insured and acquires no lesser or greater rights than those held by the insured.

### III. DIRECT DUTY OWED BY PRIMARY INSURER TO EXCESS INSURER

Courts have held that a primary insurer owes a good-faith duty to defend and attempt to settle a claim within policy limits directly to an excess insurer, in spite of the fact that no contractual relationship between the two carriers exists. The

---

[3] See, e.g., *Peter v Travelers Ins Co,* 375 F Supp 1347, 1350 (CD Cal, 1974), and Sutterfield, *supra,* 640.

California courts' analyses of this problem is instructive, as they have considered the existence of duties outside those imposed by a contractual relationship. See Smith, *supra.*

When the insured and the primary insurer conspired to fraudulently assign dates of loss to policy years other than those in which the losses actually occurred, the Second District of the California Court of Appeals held that the excess insurer had a direct cause of action against *both* the insured and the primary insurer for breach of the duty of good faith and fair dealing. *Kaiser Foundation Hospitals v North Star Reinsurance Corp,* 90 Cal App 3d 786, 792; 153 Cal Rptr 678 (1979). The court held that the covenant of good faith and fair dealing was not a "one-way street but requires that 'neither party'—not the insured, nor the insurer—'will do anything to injure the right of the other to receive the benefits of the agreement . . . .' " *Id.* (citations omitted).

In the same year, the Third District of the Court of Appeals held that a primary insurer owes a duty directly to an excess insurer to defend and settle a liability claim in good faith. *Transit Casualty Co v Spink Corp,* 94 Cal App 3d 124; 156 Cal Rptr 360 (1979). In *Spink,* the insured had refused to settle under any circumstances, and the excess insurer was required to pay $175,000 to satisfy a jury verdict. The excess insurer also contributed $285,000 to settle other death and injury claims resulting from the insured's negligence, and it claimed that the failure to settle in the first case had ultimately increased the settlement outlay on the later claims.

Because the insured had contributed to the primary insurer's failure to settle, the excess insurer gained nothing from stepping into the shoes of the insured under the doctrine of equitable subroga-

tion. The court found that equitable subrogation failed to "achieve evenhanded justice," and that "[t]riangular reciprocity" of obligations was the more rational rule of liability. *Id.,* 132-133. The court reasoned that a theory of liability resting on reciprocal duties of reasonable care owed by each of the three parties to each other would promote the sharing of the loss according to the measure of each party's comparative fault. *Id.,* 135-136. The court contrasted this result with that achieved through equitable subrogation, which it characterized as "all-or-nothing" "litigation success or defeat according to the measure of conduct [by the primary insurer or the insured] over which the [excess insurer had no] control." *Id.,* 134. Thus, a significant reason for *Spink's* adoption of "triangular reciprocity" was the perception that an excess carrier might otherwise be unjustly denied recovery against a primary carrier when the insured had contributed to the bad-faith failure to settle.

The First District of the California Court of Appeals disagreed with *Spink's* theory of triangular reciprocity. *Commercial Union Assurance Cos v Safeway Stores, Inc,* 158 Cal Rptr 97 (Cal App, 1979), aff'd 26 Cal 3d 912; 164 Cal Rptr 709; 610 P2d 1038 (1980). In *Safeway,* the appellate court held that an insured contemplating settlement had no duty to give the excess insurer's financial interests equal consideration with its own. The court reasoned that the bargained-for expectations of the parties, and the disparity in bargaining power between the insured and its excess insurer, made it unnecessary to impose additional duties on the insured to protect the insurer from injustice. *Id.,* 158 Cal Rptr 101-102. However, *Safeway* is distinguishable from the situation in *Spink* and the case at bar. In *Safeway,* there was no primary carrier because the insured was self-insured up to a cer-

tain limit. Therefore the conflict arose between the insured and its excess insurer (parties in privity), rather than between the primary insurer and the excess insurer. In addition, when the California Supreme Court affirmed the decision in *Safeway,* it adopted the opinion of the Court of Appeals, but deleted that portion of the Court of Appeals opinion which criticized *Spink's* recognition of triangular reciprocity. *Commercial Union Assurance Cos v Safeway Stores, supra,* 26 Cal 3d 915, 920-921. From this we conclude that the California Supreme Court has not ruled upon the *Spink* doctrine of "triangular reciprocity."

Cu's primary argument in favor of recognizing a direct duty of good faith running from the primary to the excess insurer is very similar to the *Spink* theory: Cu believes that, absent such a duty, the excess insurer will be at the mercy of the conduct of its insured. It is true that the insured's breach of obligations owed to the primary insurer can defeat the subrogation claim of its excess insurer. However, the insured and the excess insurer share an ongoing contractual relationship as parties to their own contract. The excess insurer can bargain for any obligation it seeks to impose upon its insured. If the insured breaches a duty owed to the excess insurer, the excess insurer can refuse coverage or pursue an action against its own insured. In this way, legitimate expectations of all three parties, the insured, the primary insurer, and the excess insurer, can be traced to bargained-for agreements. Such an arrangement promotes certainty in the setting of rate structures, which in turn keeps insurance costs down and encourages policyholders to carry excess insurance, to the

benefit of the insured and third-party judgment creditors alike.[4]

Two other jurisdictions have addressed the direct duty theory, but without the depth or clarity of the California courts. In *Estate of Penn v Amalgamated General Agencies,* 148 NJ Super 419, 422-423; 372 A2d 1124 (1977), the New Jersey Superior Court apparently adopted the direct duty theory, although in doing so it relied on case authority recognizing the equitable subrogation theory. The New York Court of Appeals did not explicitly discuss the direct duty theory in *Hartford Accident & Indemnity Co v Michigan Mutual Ins Co,* 61 NY2d 569, 574; 463 NE2d 608 (1984), but held somewhat ambiguously that the primary insurer owed the excess insurer "the same duty to act in good faith which [the primary insurer] owed to its own insureds . . . ." While supportive of the increased interest in a direct duty rule, these cases nonetheless add little to our analysis.

After an examination of the facts in the instant case, we conclude that it is not the most appropriate case on which to decide the application of the direct duty rule. Cu is alleged to have participated in the settlement process because of its December 21, 1978, letter of protest to MP, its discussions with MP and Wulfmeier on the first day of trial, and its eventual payment of $125,000 of the $350,000 settlement. Cu may argue for recognition of the direct duty theory, but it may be estopped from gaining the benefit. Thus, however appealing the theory of direct duty, this case does not present itself as the best vehicle for recognition of a

---

[4] See also Note, *Involuntary assignment of a cause of action for bad faith failure to settle within the policy limits,* 1984 S Ill U L J 365, 378.

direct duty cause of action in tort between a primary insurer and excess insurer.[5]

There is also the argument that the excess insurer had the ability to protect itself from the insured's bad-faith conduct through a noncoöperation clause.

For these reasons, we would hold that in this case the primary carrier does not owe a direct duty to the excess carrier to act in good faith to

[5] We decline to state that, under certain conditions, a direct duty of good faith and due care from a primary insurer toward an excess insurer is inappropriate. Whether a primary insurer owes a duty to act in good faith or with due care toward an excess insurer as well as the insured is analogous to the question whether a manufacturer owes a duty to act with due care toward an ultimate purchaser as well as a retailer of his product, or whether a professional who undertakes a service in a contract owes a duty to act with due care toward third parties who foreseeably will be affected as well as toward the person with whom the professional makes the contract. This Court has held that in the case of the manufacturer and the professional there is liability.

In these cases, a contract between two parties gives rise to contractual duties. Breach of a contractual duty causes injury to a third party, who is then allowed to bring a tort action. In *Spence v Three Rivers Builders & Masonry Supply, Inc,* 353 Mich 120; 90 NW2d 873 (1958), a manufacturer's breach of an implied warranty of merchantability in a contract of sale gave rise to a tort action in favor of an injured ultimate consumer of the product. In *Clark v Dalman,* 379 Mich 251; 150 NW2d 755 (1967), a repair contractor's breach of the contractual duty to notify an inspector of work completed, and his breach of the common-law duty to act reasonably so as not to endanger licensees or invitees, gave rise to a tort action in favor of an injured inspector. In *Crews v General Motors Corp,* 400 Mich 208; 253 NW2d 617 (1977), a manufacturer's breach of the duty to make reasonable repairs imposed in a sales contract gave rise to a tort action in favor of the purchaser's injured employee. In *Williams v Polgar,* 391 Mich 6; 215 NW2d 149 (1974), a title abstracter's breach of the duty to perform in a diligent and reasonably skillful manner implied in a contract for its services gave rise to a tort action for negligent misrepresentation in favor of the foreseeable users of the abstract of title, the land seller's grantees. While in all cases the existence of a contractual relationship created "the relation out of which [arose] the common-law duty to exercise ordinary care," *Clark, supra,* 261, in none of them was the lack of privity between plaintiff and defendant a bar to recovery. However, recovery was permitted only by those whose relationship to the action taken under the contract was reasonably foreseeable. In addition, the scope of the duty owed to the party not in privity was no greater than that already owed to the party in privity.

defend and settle a claim within the former's policy limits. If the excess carrier is to proceed against the primary carrier, it must do so as the subrogee of the insured. Accord *Bohemia, Inc v Home Ins Co,* 725 F2d 506, 512, n 6 (CA 9, 1984).

### IV. PROPRIETY OF SUMMARY JUDGMENT

The trial court granted MP's motion for summary judgment pursuant to GCR 1963, 117.2(1), for failure to state a claim upon which relief can be granted. The trial court found that MP's good-faith duty to defend and settle ran only to Dr. Berman, its insured. The court also found that CU was estopped from claiming injury as a result of MP's action, because CU participated in the settlement negotiations and approved the settlement amount, thereby inducing MP to forego any further legal action such as appealing the trial court's refusal to set aside the default judgment, or proceeding to trial on the damages question.

The trial court improperly granted summary judgment. First, CU has stated a claim upon which relief can be granted: As the equitable subrogee of the insured, CU can claim damages for injuries resulting from MP's alleged failure to defend and settle in good faith or with due care. Second, for the reasons ably set forth in the Court of Appeals opinion, material issues of fact exist as to whether MP acted in good faith, whether MP reasonably relied on CU's participation in the final settlement, and whether the insured failed to coöperate. *Commercial Union Ins Co, supra,* 421-424. For these reasons, summary disposition was improper.

On the basis of our analysis, the judgment of the Court of Appeals should be affirmed except for its premature recognition, on the facts of this case, of a duty to act in good faith running directly from

the primary insurer to the excess insurer, and this case should be remanded to the circuit court for proceedings consistent with this opinion.

CAVANAGH and ARCHER, JJ., concurred with WILLIAMS, C.J.

BOYLE, J. I concur with the result and the reasoning behind Chief Justice WILLIAMS' findings that in this case the excess insurer's cause of action against the primary insurer is as equitable subrogee of the insured and that there is no direct duty between the primary and excess insurers. I write separately to state further that, contrary to the assertion in footnote 5 of Chief Justice WILLIAMS' opinion, I find no convincing legal precedent or reasoning and no policy considerations which would lead me to determine that such an expansion of traditional tort doctrine is appropriate in these circumstances. As the opinion astutely states:

> [T]he insured and the excess insurer share an ongoing contractual relationship as parties to their own contract. The excess insurer can bargain for any obligation it seeks to impose upon its insured.

I further agree that summary disposition was improper because "material issues of fact exist as to whether MP acted in good faith, whether MP reasonably relied on CU's participation in the final settlement, and whether the insured failed to coöperate."

LEVIN, BRICKLEY, and RILEY, JJ., concurred with BOYLE, J.