### CONTINENTAL CASUALTY COMPANY

v.

### PULLMAN, COMLEY, BRADLEY & REEVES, et al.

### Civ. No. B-88-353 (AHN).

United States District Court,
D. Connecticut.

March 14, 1989.

Jacob D. Zeldes, L. Douglas Shrader, Zeldes, Needle & Cooper, P.C., Bridgeport, Conn., for plaintiff.

John C. Heffernan, Heffernan, Farr, Morrelli & McChord, Hartford, Conn., Cushing O. Condon, Ford, Marrin, Esposito & Whitmeyer, New York City, for defendant.

## RULING ON MOTION FOR JUDGMENT ON THE PLEADINGS

NEVAS, District Judge.

Continental Casualty Company ("Continental"), the plaintiff in this diversity action, brought a two count complaint against the Connecticut law firm of Pullman, Comley, Bradley & Reeves and its partners (collectively "Pullman"), and against The Aetna Casualty & Surety Company ("Aetna"). Count one alleges legal malpractice by Pullman while defending a medical malpractice action tried in Connecticut state court, and count two charges Aetna with lack of good faith, negligence, and breach of its obligation to provide competent defense in the state suit. Pullman answered the complaint and is now pursuing a Rule 12(c), Fed.R.Civ.P., motion for judgment on the pleadings. For the reasons that follow, Pullman's motion is granted with leave for the plaintiff to amend.

### I.

### A.

Rule 12(c), Fed.R.Civ.P., provides:

> After the pleadings are closed but within such time as not to delay the trial, any party may move for judgment on the pleadings. If, on a motion for judgment on the pleadings, matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.

A Rule 12(c) motion may be granted "where material facts are undisputed and where a judgment on the merits is possible merely by considering the contents of the pleadings." *Sellers v. M.C. Floor Crafters, Inc.,* 842 F.2d 639, 642 (2d Cir.1988) (citation omitted). When passing on a motion for judgment on the pleadings, a court must accept as true all well-pleaded facts alleged in the complaint and refrain from dismissing the action unless the non-movant can prove no set of facts that would entitle it to relief. *Bloor v. Carro, Spanbock, Londin, Rodman & Fass,* 754 F.2d 57, 61 (2d Cir.1985).

### B.

Against this backdrop, Continental's complaint sketches the following narrative: In 1984 The Griffin Hospital ("Griffin") was sued because a newborn had suffered catastrophic injury in the hospital's delivery room.[1] Aetna provided primary insurance coverage for Griffin in the ensuing state court action. Aetna also retained Pullman to defend the hospital against the medical malpractice claim. Continental was Griffin's excess carrier, contractually obligated for losses ranging from one-half to twenty million dollars. The state court jury returned a verdict against the hospital; Continental paid $10,038,357 in satisfaction of that judgment.[2]

According to the plaintiff, Pullman, in addition to representing Griffin, also "represented Continental as excess insurer....," Complaint, para. 22, and in the course of defending the suit "failed to defend ... properly and ... negligently failed to comport with applicable legal standards of professional conduct." *Id.,* para. 27. Continental sets forth a series of purported omissions by Pullman, including failure to: prepare properly for trial; conduct adequate discovery; introduce certain expert evidence; request applicable jury charges; and seek bifurcation of the trial into liability and damages phases. *Id.,* para. 28(a), (c), (e), (f), (h), and (j). As for Aetna, the primary insurer "failed to act in good faith in defending the [suit], acted negligently in preparing and providing that defense, failed to provide a proper and competent defense and failed to safeguard Continental's interests." *Id.,* para. 33. The plaintiff alleges a direct right of recovery for the $10,038,357 it paid, an indirect right

---

1. *Mather v. The Griffin Hosp.* (Judicial District of New Haven).

2. On appeal the Connecticut Supreme Court upheld the verdict and found that the damages were not excessive. *Mather v. The Griffin Hospital,* 207 Conn. 125, 540 A.2d 666 (1988).

as a "foreseeable beneficiary" of Pullman's services, and "the right to proceed upon all rights and remedies otherwise available to [Griffin], in the place of [Griffin]." *Id.*, paras. 19–22, 25.

## II.

A federal court sitting in diversity must be mindful that it follow the law determined by the highest court of the state whose law is applicable to resolution of the dispute. *Plummer v. Lederle Laboratories*, 819 F.2d 349, 355 (2d Cir.), *cert. denied*, —— U.S. ——, 108 S.Ct. 232, 98 L.Ed. 2d 191 (1987). When that state court has not directly ruled on the issue under consideration, the federal court " 'must make an estimate of what the state's highest court would rule to be its law.' " *Carpentino v. Transport Ins. Co.*, 609 F.Supp. 556, 560 (D.Conn.1985) (Zampano, J.) (quoting *Cunninghame v. Equitable Life Assurance Soc'y of the United States*, 652 F.2d 306, 308 (2d Cir.1981)). *See also Plummer*, 819 F.2d at 355. In calculating this estimate, the federal court may consider all data the high court would use in reaching its decision. *Doyle v. St. Paul Fire & Marine Ins. Co.*, 583 F.Supp. 554, 555 (D.Conn. 1984) (Dorsey, J.). Thus, the federal court may discern the forum state's law by examining relevant decisions from the forum state's inferior courts, decisions from sister states, federal decisions, and the general weight and trend of authority.

■ Pullman's motion raises an issue of first impression in Connecticut: whether an excess insurance carrier has standing to maintain a legal malpractice action against the defense counsel retained for the insured by the primary insurer.[3] Continental offers alternative theories in support of its right to sue Pullman. First, the plaintiff argues that an attorney-client relationship existed by operation of law because Continental was an intended or foreseeable beneficiary of Pullman's legal services on behalf of Griffin. Second, the plaintiff contends that it is an equitable subrogee of Griffin, imbued with the insured's right to sue Pullman for malpractice. Last, Continental pleads that an actual attorney-client relationship existed between Pullman and the plaintiff. Each of these theories will be addressed in turn.

### A.

Though the supreme court has not determined whether defense counsel for an insured owes a non-contractual duty of care to an excess carrier, the court has had the opportunity recently to comment in another context about the nature of the attorney-client relationship and an attorney's obligations to non-clients. In *Krawczyk v. Stingle*, 208 Conn. 239, 247, 543 A.2d 733, 736 (1988), the court held that the intended beneficiaries of an estate cannot maintain a cause of action for legal malpractice against the decedent's attorney for counsel's negligent failure to execute estate planning documents in a timely fashion. The facts in *Krawczyk* bear no resemblance to those in the instant matter, but the case deserves consideration for two reasons. First, the court's pronouncements on the dimensions of the attorney-client relationship are instructive on the issues before this court. Second, Continental bases part of its cause of action on the intended beneficiary theory relied on by the plaintiffs in *Krawczyk*. *See* Complaint, paras. 19 and 21.

---

**3.** Neither party has addressed the question of the applicable state law. Instead, both Continental and Pullman assume that Connecticut law applies. Invoking Connecticut conflict of laws principles, as required by *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941), the court concludes that a Connecticut court would apply its substantive law to the issues raised by this motion. In the record before the court, the only factual tie to a state other than Connecticut is the Illinois corporate citizenship of Continental. Under either a tort choice of law analysis, *see*

*O'Connor v. O'Connor*, 201 Conn. 632, 519 A.2d 13 (1986), or a contract analysis, *see Whitfield v. Empire Mut. Ins. Co.*, 167 Conn. 499, 356 A.2d 139 (1975), Connecticut law governs resolution of the instant dispute.

Furthermore, in analyzing the primary issue presented by this motion, the court expresses no opinion on what reciprocal duties, if any, might run between an excess and primary insurer, an excess insurer and the insured, a primary insurer and the insured, or even the primary insurer and the insured's counsel.

The decedent in *Krawczyk* hired an attorney to prepare trust documents with certain of his relatives to be named as the intended beneficiaries of the estate. 208 Conn. at 241, 543 A.2d at 733–34. Several dates for execution of the documents passed because the attorney needed additional information for the completion of the instruments. Two days before the last scheduled execution date, the decedent suffered a massive heart attack and was hospitalized. Though informed about this development, the decedent's attorney did not continue work on the trust documents. The next day, the attorney received a telephone call from one of the intended beneficiaries, who told her to bring the documents to the hospital because the decedent's condition was rapidly deteriorating. After working for two hours, the attorney completed preparation of the instruments, but upon arrival at the hospital was unable to see the decedent, who died shortly thereafter without having executed the documents. *Id.* at 242–43, 543 A.2d at 734.

The intended beneficiaries sued the decedent's attorney and her law firm for legal malpractice. The jury found for the plaintiffs and awarded them $65,000. *Id.* at 241, 543 A.2d at 733. On appeal the supreme court began its analysis by recognizing a general rule: "[A]ttorneys are not liable to persons other than their clients for the negligent rendering of services." *Id.* at 244, 543 A.2d at 735. The court noted, however, that some jurisdictions have permitted an exception to the general rule "when the plaintiff can demonstrate that he or she was the intended or foreseeable beneficiary of the attorney's services." *Id.* at 244–45, 543 A.2d at 735 (citing, among

other sources, *Mozzochi v. Beck*, 204 Conn. 490, 499, 529 A.2d 171, 175 (1987)). After citing instances where attorneys who purportedly erred in the preparation or execution of wills were held liable to the intended beneficiaries,[4] the court posited whether this liability should be expanded to include negligent delay in preparing trust instruments for execution by the client. *Krawczyk*, 208 Conn. at 245, 543 A.2d at 735.

Before concluding that expansion would be improper in the situation before it, the *Krawczyk* court set forth a test for determining when such liability should be allowed. A court must "look[ ] principally to whether the primary or direct purpose of the transaction was to benefit the third party." [5] *Id.* at 245, 543 A.2d at 735 (citations omitted). The court continued:

> Courts have refrained from imposing liability when such liability had the *potential* of interfering with the ethical obligations owed by an attorney to his or her client. *See, e.g., Parnell v. Smart*, 66 Cal.App.3d 833, 837–38, 136 Cal.Rptr. 246 (1977) (in adversary proceedings, attorney for insurance carrier owed no duty to insured).... We conclude that the imposition of liability to third parties for negligent delay in the execution of estate planning documents would not comport with a lawyer's duty of *undivided* loyalty to the client.

*Krawczyk*, 208 Conn. at 246, 543 A.2d at 736 (emphases added). According to the court, an attorney's obligation of undivided loyalty

> would be undermined were an attorney to be held liable to third parties if, due to

---

**4.** In *Stowe v. Smith*, 184 Conn. 194, 197, 441 A.2d 81, 83 (1981), for example, the supreme court ruled that the plaintiff beneficiary had stated a cause of action against the attorney for the testatrix when the will failed at probate. According to the court, a cause of action exists if a complaint alleges that the testatrix and her attorney had intended that the attorney would assume a direct obligation to the decedent's intended beneficiaries. "A promise to prepare a will pursuant to the instructions of a testatrix states a direct obligation to render a performance beneficial to her, i.e., the creation of a document which would enable her upon her death to effect the transfer of her assets to the

beneficiaries named in her instructions." *Id.* at 197–98, 441 A.2d at 83 (citation omitted). *Stowe* embodies a narrow exception—essentially limited to wills only—to the rule that an attorney has no duty to a third party.

**5.** Other factors that can be considered include "the foreseeability of harm, the proximity of the injury to the conduct complained of, the policy of preventing future harm and the burden on the legal profession that would result from the imposition of liability." *Krawczyk*, 208 Conn. at 245–46, 543 A.2d at 735 (citations omitted).

the attorney's delay, the testator did not have an opportunity to execute estate planning documents prior to death. Imposition of liability would create an incentive for an attorney to exert pressure on a client to complete and execute estate planning documents summarily. Fear of liability to potential third party beneficiaries would contravene the attorney's primary responsibility to ensure that the proposed estate plan effectuates the client's wishes and that the client understands the available options and the legal and practical implications of whatever course of action is ultimately chosen.

*Id.* at 246–47, 543 A.2d at 736. Finding "serious potential for conflicts of interest" among the facts before it, the *Krawczyk* court concluded that "[p]rophylactic principles of public policy counsel against rules of liability that promote such conflicts...." *Id.* at 247, 543 A.2d at 736.

The lessons of *Krawczyk* resonate beyond the facts before the court there. Protection of an attorney's duty of " '[e]ntire devotion to the interest of the client' " was the overarching theme developed by the court. *Id.* at 246, 543 A.2d at 736 (quoting G. Sharswood, *An Essay on Professional Ethics* 78 (5th ed. 1896)). *Accord Mozzochi*, 204 Conn. at 497, 529 A.2d at 174 (an attorney's "primary duty [is the] robust representation of the interests of his or her client."). This court need search neither long nor wide to identify significant potential conflicts of interest inherent in the relationship between an insured and its excess carrier that would intrude on the special duty an insured's counsel owes to the client alone. It is not difficult to envision a situation where the interests of the insured and excess insurer could diverge in a medical malpractice action, though the two would not traditionally be adversaries in the litigation. A crossroads may arrive during the course of a suit where either the insured or excess carrier wishes to settle, yet the other party desires continued pursuit of a vigorous defense. In such an antagonistic situation, an attorney with a contractual obligation to the insured and a judicially-imposed obligation to the overage carrier may face an irreconcilable conflict of interest. Not only would the attorney's loyalty to the insured be dissipated, but counsel might be open to a malpractice action by his client in fact.

■ Clearly, under the "primary or direct purpose" test of *Krawczyk*, Pullman's defense of Griffin was not intended to inure to the principal benefit of the plaintiff. At the most, Continental stood as an incidental beneficiary of Pullman's services. Moreover, the court can perceive no public policy reason for exercising its equitable powers to protect Continental. To the extent the excess insurer considered itself at risk in the state court suit, it could have retained counsel to monitor the litigation and to protect its interests. Continental is hardly a neophyte in these matters; what it asks this unwilling court to do is to sanction a procedure whereby an excess carrier can remain silent yet challenge the defense and strategy in the face of an adverse judgment. Equity does not mandate such a result.

Two New York cases serve as partial underpinning for the plaintiff's contention that Pullman owed the excess insurer a duty of care. Both cases are unpersuasive. In *Hartford Accident & Indem. Co. v. Michigan Mut. Ins. Co.*, 61 N.Y.2d 569, 463 N.E.2d 608, 475 N.Y.S.2d 267 (1984), the defendant primary insurer provided general liability and workers' compensation insurance for a parent corporation and two of its subsidiaries. The plaintiff furnished excess coverage for the three companies. An injured employee of one of the subsidiaries brought a negligence action against the parent and other subsidiary. *Id.* at 572, 463 N.E.2d at 609, 475 N.Y.S.2d at 268. The primary carrier obtained defense counsel for the insureds. At some point in the litigation, the plaintiff demanded that the remaining subsidiary be impleaded, but the primary insurer and its attorneys failed to do so, apparently because the primary insurer would have been required to defend and indemnify the impleaded party. *Id.* at 572–73, 463 N.E.2d at 609–10, 475 N.Y.S.2d at 268. The case eventually settled, with the excess carrier paying some one-third of the settlement figure. A suit by the excess

insurer followed against the primary insurer for legal malpractice and breach of fiduciary duty. *Id.* at 573, 463 N.E.2d at 610, 475 N.Y.S.2d at 268–69. On appeal New York's high court found that the defendant owed the excess carrier "the same duty to act in good faith which [the primary insurer] owed to its own insureds...." *Id.* at 574, 463 N.E.2d at 610, 475 N.Y.S.2d at 269 (citations omitted). Notably, the case is devoid of any discussion about what obligation, if any, is owed by an insured's counsel to an excess carrier.

In the second New York case, *Great Atl. Ins. Co. v. Weinstein,* 125 A.D.2d 214, 509 N.Y.S.2d 325 (1986), the intermediate appellate court found that the complaint stated a cause of action when it alleged that defense counsel owed a duty to exert his best efforts on behalf of the insured and excess carrier, the latter a subrogee of the former. There, the court noted the possibility of serious ethical violations because the attorney had purportedly represented co-defendants with adverse interests. *Id.* at 216, 509 N.Y.S.2d at 327. Though Pullman was allegedly negligent in its representation of Griffin—and by extension, Continental—the complaint in the instant proceeding does not intimate any ethical improprieties on the law firm's part.

In addition to being factually dissimilar to the present case, the two New York authorities are conspicuously free of any of the policy considerations discussed and weighed in *Krawczyk.* Given the supreme court's affirmation in *Krawczyk* and *Mozzochi* of the almost sacrosanct nature of the attorney-client bond, and the court's reluctance to allow even potential disruptions of that tie except under the most limited of circumstances, this court, in its role as diviner of the high court's actions, is convinced that the supreme court would find that no implied attorney-client relationship exists between an insured's counsel and the excess carrier. Imposition of a duty of care in this situation would seriously impair an attorney's ability to represent his or her client's interests in an uncompromised fashion.

## B.

In addition to its arguments that it has standing to sue Pullman directly, the plaintiff pleads and argues that it has acquired rights—through the doctrine of equitable subrogation—available to Griffin. "Where property of one person is used in discharging an obligation owed by another ..., under such circumstances that the other would be unjustly enriched by the retention of the benefit thus conferred, the former is entitled to be subrogated to the position of the obligee...." Restatement of Restitution Section 162 (1937). "Legal" —or "equitable"—subrogation is grounded in equity and arises by operation of law; "conventional" subrogation, by contrast, arises by express or implied contract or agreement. *Commercial Standard Ins. Co. v. American Employers Ins. Co.,* 209 F.2d 60, 64 (6th Cir.1954). Equitable subrogation, then, is a legal fiction entitling a person to reimbursement for discharging the debt or obligation for one who should have paid it. *Home Owners' Loan Corp. v. Sears, Roebuck & Co.,* 123 Conn. 232, 238, 193 A. 769, 772 (1937). A subrogee, however, has no rights against a third person beyond what the subrogor could exercise. *Connecticut Sav. Bank v. First Nat'l Bank & Trust Co.,* 138 Conn. 298, 305, 84 A.2d 267, 270 (1951); *Continental Ins. Co. v. Connecticut Natural Gas Corp.,* 5 Conn.App. 53, 60, 497 A.2d 54, 59 (1985).

There can be no dispute that Griffin, as the insured, would have standing to pursue a direct cause of action against Pullman for alleged acts of legal malpractice during the defense of the hospital in the state court suit.[6] As a legal consequence of its relationship with Griffin, the plaintiff argues that it acquired the recoupment remedy available to Griffin when the excess insurer paid a debt for which Pullman was primarily liable. Assuming for argument's sake

---

**6.** Likewise, it seems clear that Continental would have the right to seek an equitable distribution of the proceeds if Griffin were to recover on a legal malpractice claim against Pullman. *See Berlinski v. Ovellette,* 164 Conn. 482, 489, 325 A.2d 239, 243 (1973).

that Continental is an equitable subrogee of the hospital, the parties have not identified—and the court has been unable to locate—any Connecticut law on the equitable subrogation positions taken by the litigants. Pullman, however, has cited a recent Michigan Court of Appeals case purportedly on all fours with the facts in the instant proceeding.

In *American Employers' Ins. Co. v. Medical Protective Co.*, 165 Mich.App. 657, 419 N.W.2d 447 (1988), a physician sued for malpractice carried primary liability insurance of $200,000 with the defendant and excess liability insurance worth $1 million with the plaintiff. The primary carrier hired counsel to defend the suit, which resulted in a $900,000 verdict and judgment against the doctor. *Id.* at 658, 419 N.W.2d at 447–48. The excess insurer then sued the primary insurer and defense counsel's law firm, alleging various acts of negligence and legal malpractice. The excess carrier also alleged that the law firm was an agent of the primary insurer and that the plaintiff was therefore subrogated to the rights of the insured against his counsel. *Id.* at 659, 419 N.W.2d at 448.

The lower court granted the defendant law firm's motion for summary disposition after finding that the excess insurer lacked a recognizable cause of action. *Id.* At the appellate level, the excess carrier asked the court to extend the holding of a Michigan Supreme Court case where the high court had found that an excess carrier is an equitable subrogee of an insured and may sue a *primary carrier* for bad faith failure to defend or settle. *Id.* (citing *Commercial Union Ins. Co. v. Medical Protective Co.*, 426 Mich. 109, 393 N.W.2d 479 (1986)) (emphasis added). In declining to extend that holding, the court of appeals noted that "the interests of insurer and insured are not identical and may at times con-

flict," even though "an excess insurer is not an adverse party in litigation...." *American Employers' Ins. Co.*, 165 Mich. App. at 660, 419 N.W.2d at 448. The court continued:

> Although the plaintiff excess insurer may be characterized as an equitable subrogee of the insured physician, it may not sue the insured's defense attorney for legal malpractice. To hold otherwise would in our judgment acknowledge a direct duty owed by the insured's attorney to the excess insurer and would be tantamount to saying that insurance defense attorneys do not owe their duty of loyalty and zealous representation to the insured client alone. Such a holding would contradict the personal nature of the attorney-client relationship, which permits a legal malpractice action to accrue only to the attorney's client. [Citations omitted.] Such a holding would also encourage excess insurers to sue defense attorneys for malpractice whenever they are disgruntled by having to pay within limits of policies to which they contracted and for which they received premiums. Were this to occur, we believe that defense attorneys would come to fear such attacks, and the attorney-client relationship would be put in jeopardy.

*Id.* at 660–61, 419 N.W.2d at 448–49.

■ Notwithstanding Continental's contention that *American Employers'* is poorly reasoned, this court is persuaded that the Connecticut Supreme Court would follow the lead set by the Michigan court and decline to recognize the justiciability of an equitable subrogation claim brought by an excess insurer against the insured's counsel. *American Employers'* and *Krawczyk* are in harmony in finding unacceptable even potential strains that could disrupt the attorney-client bond.[7]

---

7. In further support of its argument that the supreme court would not permit an excess carrier to bring a legal malpractice action as the subrogee of the insured, Pullman draws this court's attention to a line of cases that have found claims for such malpractice unassignable. While subrogation is a creature of equity that exists by operation of law, "assignment is a volitional transaction between parties." *First*

*Vermont Bank & Trust Co. v. Kalomiris,* 138 Vt. 481, 418 A.2d 43, 44 (1980) (citation omitted). In the oft-cited case of *Goodley v. Wank & Wank, Inc.,* 62 Cal.App.3d 389, 397, 133 Cal. Rptr. 83, 87 (1976), the court defended its holding thusly:

> It is the unique quality of legal services, the personal nature of the attorney's duty to the

## C.

■ A final matter remains. In paragraph 22 of the complaint, the plaintiff alleges that Pullman "represented" Continental in the state court lawsuit, and in paragraph 23 that Pullman "conducted all pretrial proceedings and tried the [state court suit] ... as counsel for Continental, Aetna and [Griffin]." Complaint, paras. 22 & 23. Pullman argues that these allegations of a direct attorney-client relationship should not be read alone but only when conjoined with the plaintiff's "foreseeable beneficiary" allegations set forth in the three paragraphs immediately preceding numbers 22 and 23. In the alternative, Pullman argues that Continental will be unable to prove the existence of an employment contract between these parties. The court is mindful, however, of the blinder it must wear when deciding a Rule 12(c) motion. Construing paragraphs 22 and 23 in the light most favorable to Continental, the court concludes that the allegations state a cause of action distinct from that asserted in paragraphs 19 through 21. However, the court also finds that paragraphs 22 and 23 are conclusory in nature and unsupported by facts that would demonstrate a contractual basis for an attorney-client arrangement between Pullman and Continental. The court grants the defendant's motion as to the cause of action asserted in paragraphs 22 and 23, but allows Continental to amend its complaint—if it can in good faith do so—with facts demonstrating the existence of a direct attorney-client relationship. Requiring Continental to supplement its allegations should not be a harsh burden. Facts indicating the relationship

---

client and the confidentiality of the attorney-client relationship that invoke public policy considerations in our conclusion that malpractice claims should not be subject to assignment. The assignment of such claims could relegate the legal malpractice action to the market place and convert it to a commodity to be exploited and transferred to economic bidders who have never had a professional relationship with the attorney and to whom the attorney has never owed a legal duty, and who have never had any prior connection with the assignor or his rights. The commercial aspect of assignability of choses in action arising out of legal malpractice is rife with probabilities that could only debase the legal profession. The almost certain end result of merchandizing such causes of action is the lucrative business of factoring malpractice claims which would encourage unjustified lawsuits against members of the legal profession, generate an increase in legal malpractice litigation, promote champerty and force attorneys to defend themselves against strangers. The endless complications and litigious intricacies arising out of such commercial activities would place an undue burden on not only the legal profession but the already overburdened judicial system, restrict the availability of competent legal services, embarrass the attorney-client relationship and imperil the sanctity of the highly confidential and fiduciary relationship existing between attorney and client.

*Accord Washington v. Fireman's Fund Ins. Co.,* 459 So.2d 1148 (Fla.App.1984) (*per curiam*); *Brocato v. Prairie State Farmers Ins. Ass'n,* 166 Ill.App.3d 986, 117 Ill.Dec. 849, 520 N.E.2d 1200 (1988); *Clement v. Prestwich,* 114 Ill.App.3d 479, 70 Ill.Dec. 161, 448 N.E.2d 1039 (1983); *Coffey v. Jefferson County Bd. of Educ.,* 756 S.W.2d 155 (Ky.App.1988); *Moorhouse v. Ambassador Ins. Co.,* 147 Mich.App. 412, 383 N.W.2d 219 (1985); *Joos v. Drillock,* 127 Mich.App. 99, 338 N.W.2d 736 (1983); *Chaffee v. Smith,* 645 P.2d 966 (Nev. 1982) (*per curiam*) (all emphasizing the personal nature of the attorney-client relationship and the potential for abuse as reasons for declining to recognize assignments of legal malpractice claims). A few courts have permitted assignment of legal malpractice causes of action, *see, e.g., Hedlund Mfg. Co. v. Weiser, Stapler & Spivak,* 517 Pa. 522, 539 A.2d 357 (1988); *Collins v. Fitzwater,* 277 Or. 401, 560 P.2d 1074 (1977), but this court believes that the Connecticut Supreme Court would align itself with the majority and find that assignments of legal malpractice claims offend public policy. *See, e.g., Berlinski v. Ovellette,* 164 Conn. 482, 487, 325 A.2d 239, 242 (1973) (assignments of causes of action for personal injuries void and contrary to public policy).

Admittedly, there are qualitative differences between equitable subrogation and assignment. A subrogee steps into the place of the subrogor by operation of law, while the assignee acquires his or her rights only after formal transfer by the assignor. And because equitable subrogation flows from extension of a court's equitable arm, the fear of commercial exploitation that surrounds assignments of legal malpractice claims may not be as palpable in the equitable subrogation context. However, both equitable subrogation and assignment of legal malpractice claims against an insured's counsel produce the same result—the accrual of enforceable rights by a party not privy to the attorney-client relationship. The public policy considerations that weigh against assignment of legal malpractice claims would seem to apply with equal force to the equitable subrogation of those claims.

(e.g. a letter of retention) are likely to be within the plaintiff's knowledge.

### Conclusion

For the foregoing reasons, the court grants Pullman's Rule 12(c), Fed.R.Civ.P., motion but with leave for the plaintiff to amend its complaint within 21 days from today.

SO ORDERED.