FRANKENMUTH MUTUAL INSURANCE COMPANY v KEELEY

Docket No. 81566. Argued October 4, 1988 (Calendar No. 7). Decided October 19, 1989. Rehearing granted *post,* 1226.

Joey G. Boone brought an action in the Genesee Circuit Court against Charles Keeley and Wilma Keeley, his mother, for injuries sustained as a result of gun shot wounds inflicted by Charles, which rendered him quadriplegic. At the time of the shooting, Charles Keeley was insured by Frankenmuth Mutual Insurance Company under Wilma's contract of insurance. On the same date, Frankenmuth sought a judgment declaring that the shooting was not covered under the policy because it was expected or intended from the standpoint of the insured. Boone and the Keeleys counterclaimed, charging that Frankenmuth had refused in bad faith to settle the claim and had fraudulently and deceitfully misrepresented the policy limit. The court, Earl E. Borradaile, J., determined that Frankenmuth was responsible under the policy, found that both parties were equally negligent, and entered judgment for one-half the jury's verdict. Thereafter, Boone and the Keeleys brought an action to have their counterclaims against Frankenmuth brought to trial. The court awarded Mrs. Keeley attorney fees and ruled that Frankenmuth had exhibited bad faith in failing to settle the case, but held that any damages owing to Charles Keeley with respect to Frankenmuth's breach of its duty to settle were necessarily limited to the amount that the injured party would have been able to recover from Charles Keeley absent the insurance coverage. The Court of Appeals, WEAVER, P.J., and MICHAEL J. KELLY and J. R. KIRWAN, JJ., affirmed in an unpublished opinion per curiam, but remanded the case for a determination of the extent of Charles Keeley's assets not exempt from legal process and for entry of judgment against Frankenmuth in that amount (Docket No. 89615). The parties appeal.

In an opinion by Justice ARCHER, joined by Chief Justice RILEY and opinions by Justice BOYLE and Justice CAVANAGH, the Supreme Court *held:*

An insurer that has exhibited bad faith in failing to settle a claim on behalf of its insured which results in a judgment in excess of policy limits is liable for the excess without regard to whether the insured has the capacity to pay.

1. Insurance is an agreement whereby parties give valuable

consideration for protection from and indemnification against loss, damage, injury, or liability. As servants of the public, insurance companies are held to the universally high standard of good faith; anything less should not be tolerated. Thus, an insurer is to be held liable to its insured for a judgment exceeding policy limits where the insurer, having exclusive control of settlement, fraudulently or in bad faith refuses to settle within policy limits. Adoption of this rule is the most effective way to underscore the serious concern regarding bad-faith practices in the insurance industry.

2. An insured person with little or no assets suffers injury when an excess judgment is obtained. Such injuries constitute actual damages in the most traditional sense, and an insurer cannot be allowed to flagrantly neglect the interests of its insured without facing serious consequences. In this case, because there is a direct cause and effect relationship between the bad-faith failure to settle and the entry of the excess judgment, the insurer is responsible for paying the excess.

Justice CAVANAGH concurred in the application of the judgment rule in this case, but not in the suggestion that it be rejected in a failure to defend context.

Justice BOYLE, concurring, stated that the adoption of the judgment rule requiring an insurer who in bad faith fails to settle a claim which results in a judgment in excess of the policy limits to pay the excess should be viewed narrowly. It should not be seen as establishing a new definition or standard of bad faith in such cases, nor as applying an existing definition or standard of bad faith because that issue was not before the Supreme Court. Nor should the decision be seen as being incompatible with *Stockdale v Jamison,* 416 Mich 217 (1982).

Reversed and remanded.

Justice LEVIN, joined by Justices BRICKLEY and GRIFFIN, dissenting, stated that the assessment of damages in a breach of a duty to settle is limited to the assets of the assignor not exempt from legal process. The standard should apply not only where an insurer fails to defend an insured, but also where, as in this case, it is alleged that the insurer, in bad faith, refused to settle.

The prepayment rule which requires an insured to have made some payment on a judgment is unsound; the judgment rule is the better approach. An insured should not be required to sell assets or borrow money to pay a judgment in order to maintain an action against the insurer for bad faith in failing to settle a claim within policy limits. However, adoption of the judgment rule does not justify eliminating the sense of the

prepayment rule that the insurer should not be required to pay more than the insured is able to pay on the judgment.

Until now, the rule in Michigan has been that an action for bad-faith failure to settle sounds in contract and not in tort. Contract damages seek to place an aggrieved party in the same economic position that would have obtained had the contract been performed. It is well established that as a general rule no damages will be awarded for the mental distress or emotional trauma that may be caused by a breach of contract. The system of contract remedies is not directed at compulsion of promisors to perform; rather, its aim is relief for promisees to redress breach, i.e., not to cause promisors to perform, but rather to encourage promisees to rely on promises by securing the expectation interest through the award of damages for the economic loss suffered by the promisee. While damaged credit and financial ruin are economic loss and compensable, and if the appellant could demonstrate that his credit had been damaged or that he had suffered financial ruin he should recover for such economic loss caused by the breach of contract, it does not appear on the record that his credit has been damaged to the extent of over $600,000. There should not be any concern about a windfall to an insurer. Contract damages generally are measured by the loss to the promisee, not the loss or gain by some other person.

In Michigan, damages in contract and in tort are compensatory. In other states, where mental distress and punitive damages are recoverable, concerns about windfalls to insurers and insurance industry practices have led the courts to ignore the difference between the measure of damages in contract and tort actions and to allow recovery for mental distress and punitive damages for bad-faith failure to settle. In permitting a $600,000 recovery without proof that the appellant incurred economic loss, this Court, for the first time departs from the principle of confining the damages for breach of contract by an insurer to the economic loss suffered by the promisee.

A compromise between the prepayment rule and the judgment rule should be made. The essence of the judgment rule should be accepted by eliminating the need to show partial payment, but protection for insurers along the lines of the prepayment rule should be provided by precluding collection on a judgment from the insurer beyond the amount that is or actually would be recoverable from the insured. Thus, in this case, the judgment rule should be accepted insofar as it dispenses with the need to establish that the appellant paid any amount on the judgment, and the case should be remanded to

the trial court for a determination of the extent of the appellant's assets not exempt from legal process, and for a determination of the value of the excess portion of the judgment, taking into account not only the appellant's assets not exempt from legal process but also his prospects of attaining future assets from which the judgment could be collected.

It being unclear whether the trial judge's finding of bad faith was in respect to a failure to defend or a failure to settle, the case should be remanded to the trial court for a determination of whether there was bad faith in failing to offer policy limits before the trial court rendered its decision in the declaratory judgment action. The case should at least be remanded to the Court of Appeals with a direction to consider issues raised in, but not addressed by that Court, so as to enable the insurer to argue that there is inadequate evidence to support, and that it would have been clear error to find, the factual hypothesis for reversal advanced by the majority that the insurer flagrantly neglected the interest of its insured and was guilty of deliberate bad faith in failing to offer policy limits before it did.

*Sederholm v Michigan Mutual Ins Co,* 142 Mich App 372; 370 NW2d 357 (1985) overruled.

*Garan, Lucow, Miller, Seward, Cooper & Becker, P.C.* (by *Milton Lucow* and *Rosalind Rochkind*); (*Jonathan E. Holt,* of counsel), for the plaintiff.

*Dean, Dean, Segar, Hart & Shulman, P.C.* (by *Robert L. Segar*), for the defendant.

ARCHER, J. We granted leave to appeal and cross-appeal to consider whether the trial court and the Court of Appeals correctly limited the nature and amount of damages that can be recovered by an insured when an insurer has breached its duty to settle a claim.

We hold that when an insurer has exhibited bad faith in failing to settle a claim on behalf of its insured, and a judgment in excess of the policy limits results, the insurer is liable for the excess without regard to whether the insured has the capacity to pay. Accordingly, we reverse the holding of the Court of Appeals and remand the case

to the trial court for determination of damages in accordance with this opinion.

### FACTS

On or about May 7, 1978, Joey Guy Boone was visiting his friend, Charles Keeley, at the residence of Charles' mother, Mrs. Wilma Keeley. At some point during the day, Charles Keeley had placed his shotgun in open view in the living room. According to Joey's statement to the police, Charles was "playing around with" the gun, the gun discharged, severely injuring Joey Boone. Joey Boone was rendered quadriplegic.

At the time of the shooting, Charles Keeley was insured with Frankenmuth Mutual Insurance Company.[1] The policy provided coverage for Charles through his mother's contract of insurance.

In an effort to avoid the initiation of a lawsuit, settlement negotiations were conducted between counsel for Mr. Boone and counsel for the Keeleys, but no agreement was reached. As a result, on June 8, 1979, Joey Boone filed a negligence action

[1] Charles Keeley sought coverage under the following section of the policy:

Coverage E—Personal Liability.

This Company agrees to pay on behalf of the Insured all sums which the Insured shall become legally obligated to pay as damages because of bodily injury or property damage, to which this insurance applies, caused by an occurrence. This Company shall have the right and duty, at its own expense, to defend any suit against the Insured seeking damages on account of such bodily injury or property damage, even if any of the allegations of the suit are groundless, false or fraudulent, but may make such investigation and settlement of any claim or suit as it deems expedient. This Company shall not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of this Company's liability has been exhausted by payment of judgments or settlements.

against Charles Keeley and his mother, Wilma, in Genesee Circuit Court.

On the same date, Frankenmuth sought a declaratory judgment that the injury to Mr. Boone was "expected or intended from the standpoint of the insured."[2] Frankenmuth asserted, therefore, that Charles Keeley's shooting of Joey Guy Boone was not covered under the policy.[3]

Joey Boone and the Keeleys, having joined forces, counterclaimed, charging that the insurance company had refused, in bad faith, to settle the case, despite several offers made by Joey Boone's attorney to compromise for the policy limits, $50,000. They further alleged that Frankenmuth fraudulently and deceitfully represented to Boone's attorney that the policy limit was only $25,000. The countercomplaint requested any damages deemed appropriate by the court.

[2] Apparently, the general basis for Frankenmuth's declaratory judgment action was the ongoing police investigation against Charles Keeley for assault with intent to murder. Also bolstering Frankenmuth's request for a declaration of noncoverage was Keeley's alleged prior reputation and character and a police report featuring Joey Boone's statement that Charles Keeley shot him intentionally. Specifically, the pertinent questions and answers in the statement were:

*Q.* Can you think of any reason why he [Charles Keeley] might have shot you?
*A.* I never really gave him any reason.
*Q.* You are not sure if he done [sic] this on purpose or not?
*A.* I don't know. If he didn't do it on purpose, I think you get the picture, a better spot to see me in. . . . He had said plenty times beforehand that he was going to shoot me, but I thought he was kidding me all the time. I guess I [was] wrong, he wasn't kidding me.

[3] The language contained in this exclusion reads as follows:

This policy does not include loss:
1. Under Coverage E—Personal Liability

*       *       *

f. to bodily injury or property damage which is either expected or intended from the standpoint of the Insured.

On July 6, 1981, the circuit court determined that Frankenmuth was responsible under the policy provisions to defend and, if appropriate, settle on behalf of the Keeleys. Meanwhile, in the principal case, the jury found Charles Keeley and Joey Boone equally negligent with total damages equaling $500,000. Thus, a judgment was entered against Charles Keeley in the net amount of $250,000, plus interest and costs.

Thereafter, Joey Boone and the Keeleys initiated an action to have their counterclaims brought to trial. Frankenmuth responded with a motion for summary disposition regarding each of the claims.[4] In resolving the motion, the court awarded Wilma Jean Keeley $4,152 in attorney fees. In so doing, the court simultaneously ruled that Frankenmuth exhibited bad faith in failing to settle the case.[5] More importantly, however, the court held that

[4] Wilma Keeley's counterclaim was for attorney fees which were incurred as a result of Frankenmuth's failure to settle. Joey Boone's counterclaim dealt with his argument that the calculation of interest should apply to the entire judgment amount of $250,000, and not solely to the policy limit of $50,000. Paramount, however, was Charles Keeley's counterclaim for damages from Frankenmuth as a result of its bad-faith breach of the duty to settle Boone's tort action for the policy limits.

[5] Among other inferences drawn on the basis of circumstances surrounding Joey Boone's attorney's attempts to settle the case, as well as allegations that the policy limits were misrepresented by appellee Frankenmuth during these and subsequent settlement negotiations, the evidence that appears to have contributed most significantly to the trial court's determination of bad faith, was revealed in an "interoffice" memo from a supervisor at Frankenmuth to a subordinate. The memo itself was produced by Frankenmuth in discovery, and is dated more than a year after the shooting occurred. It reads, in pertinent part, as follows:

The file material available presents, in my opinion, a rather weak policy defense. While this insured is certainly guilty of extremely careless use of a firearm, there is very little indication as to whether or not his state of mind was such that a deliberate intentional shooting occurred. The police report indicates that when the officers arrived at the scene, both boys were covered with blood, suggesting and supporting the in-

any damages owing to Charles Keeley with respect to Frankenmuth's breach of its duty to settle were necessarily limited to the amount that the injured party, Joey Boone, would have been able to recover from Charles Keeley absent the insurance coverage, i.e., the amount of Mr. Keeley's assets not exempt from legal process.

The Court of Appeals, in a unanimous decision, affirmed the ruling of the lower court in all respects.[6] However, the Court remanded the case for a determination of the extent of Charles Keeley's assets not exempt from legal process, and for entry of judgment against Frankenmuth in that amount. We subsequently granted leave to appeal.[7]

I

The substantive issue brought before the Court by the appellant, Charles Keeley, was acknowledged in this state six decades ago. *Wakefield v Globe Indemnity Co,* 246 Mich 645; 225 NW 643 (1929), involved an action brought by the City of Wakefield against its liability insurer, Globe In-

---

sured's position that he rendered aid, was in a confused state of mind, asked for instructions and was advised by the plaintiff to call an ambulance.

* * *

What concerns me is the complete lack of investigation on the part of our claim department. There are numerous unresolved areas that may clarify the all-important state of mind . . . .

As the file stands presently, I feel we have very little to justify our position. Apparently we are waiting for something to happen during the discovery process which will improve our position.

Notably, the trial court's determination that bad faith existed is not before us.

[6] *Frankenmuth Mutual Ins Co v Keeley,* unpublished opinion per curiam of the Court of Appeals, decided August 19, 1987 (Docket No. 89615).

[7] *Frankenmuth Mutual Ins Co v Keeley,* 430 Mich 857 (1988).

demnity, for the company's failure to exercise reasonable care in effecting the compromise of a tort claim brought against the city,[8] and for the company's bad faith in refusing settlement.[9]

With regard to the specific question whether Globe Indemnity had to pay the excess judgment, the *Wakefield* Court did not have the opportunity to directly answer. In dealing with the bad-faith issue first,[10] the Court ruled that the insurer was

[8] The underlying tort action in *Wakefield, Borski v City of Wakefield,* 239 Mich 656; 215 NW 19 (1927), involved the injury of Frank Borski while a passenger on one of the city's buses. At the time of the injury, the city carried a liability policy with Globe Indemnity for $10,000. Borski brought suit for damages and Globe assumed the defense. However, when Borski recovered a judgment for over $15,000, the city filed a claim against Globe for the excess judgment for its failure to settle the case.

[9] In addition to the claims mentioned, the City of Wakefield also charged negligent defense of the underlying suit. However, because the instant appellants did not raise an adequacy of defense issue in this appeal, it is not addressed here.

[10] *Commercial Union Ins Co v Liberty Mutual Ins Co,* 426 Mich 127, 138-139; 393 NW2d 161 (1986), has since defined bad-faith failure to settle on the part of an insurance company utilizing the following factors:

> 1) failure to keep the insured fully informed of all developments in the claim or suit that could reasonably affect the interests of the insured,
>
> 2) failure to inform the insured of all settlement offers that do not fall within the policy limits,
>
> 3) failure to solicit a settlement offer or initiate settlement negotiations when warranted under the circumstances,
>
> 4) failure to accept a reasonable compromise offer of settlement when the facts of the case or claim indicate obvious liability and serious injury,
>
> 5) rejection of a reasonable offer of settlement within the policy limits,
>
> 6) undue delay in accepting a reasonable offer to settle a potentially dangerous case within the policy limits where the verdict potential is high,
>
> 7) an attempt by the insurer to coerce or obtain an involuntary contribution from the insured in order to settle within the policy limits,
>
> 8) failure to make a proper investigation of the claim prior to refusing an offer of settlement within the policy limits,
>
> 9) disregarding the advice or recommendations of an adjuster or attorney,

not liable to its insured for refusal to settle unless refusal was in bad faith. Hence, because the Court did not view the actions of Globe Indemnity as constituting bad faith, it reversed the trial court, remanding for judgment in favor of Globe, leaving the damage issue substantively undecided.[11]

Nonetheless, within its text, *Wakefield* recognized the issue addressed in the case at bar:

> The courts seem to be unanimous in the opinion, as expressed by direct ruling, recognition, or assumption, that the insurer is liable to the insured for an excess of judgment over the face of the policy when the insurer, having exclusive control of settlement, fraudulently or in bad faith refuses to compromise a claim for an amount within the policy limit. [*Wakefield, supra* at 648.]

In the years that followed, *Wakefield* supplied the standard upon which courts in Michigan relied when facing allegations of bad-faith failure to settle on the part of insurance companies. In *Commercial Union Ins Co v Medical Protective Co,* 426 Mich 109, 116; 393 NW2d 479 (1986), this Court cited *Wakefield,* reasoning:

> 10) serious and recurrent negligence by the insurer,
>
> 11) refusal to settle a case within the policy limits following an excessive verdict when the chances of reversal on appeal are slight or doubtful, and
>
> 12) failure to take an appeal following a verdict in excess of the policy limits where there are reasonable grounds for such an appeal, especially where trial counsel so recommended.

Although *Commercial Union* dealt primarily with the issue of liability between excess insurers and primary insurers, many of the factors can be uniformly analyzed and applied with reference solely to primary insurers, as in the case at bar. More importantly, however, is the fact that the instant appeal does not concern the issue whether Frankenmuth acted in bad faith. This determination was made by the trial court and is not before us. Hence, the inclusion of this note merely serves to amplify clearly established Michigan law and not to provide comment on the lower court ruling here.

[11] See *Wakefield, supra* at 658-659.

[A]n insurer is liable to its insured for a judgment exceeding policy limits when the insurer, who has exclusive control of defending and settling the suit, refuses to settle within policy limits in "bad faith."[12]

## II

There are two schools of thought regarding the remedy for an insurer's bad-faith breach of its duty to settle. The jurisdictional split is distinguished by the following doctrines: the prepayment rule and the judgment rule. The older prepayment rule is the doctrine, adopted by a minority of jurisdictions, which dictates that an insurer may be held liable in an "excess" case *only* if part or all of the judgment has been paid by the insured. The judgment rule, adopted by a majority of jurisdictions, commands an insurer to pay an excess judgment in instances of bad faith, so that the insured need not make any payment nor have the capacity to pay any part of the judgment in order to recover the excess amount from the insurer. See *Carter v Pioneer Mutual Casualty Co,* 67 Ohio St 2d 146; 423 NE2d 188 (1981).

The cases relied on by the appellants clearly reveal the vigorous dichotomy of the courts in their analyses of the doctrines. For example, in *Wolfberg v Prudence Mutual Casualty Co,* 98 Ill App 2d 190, 196; 240 NE2d 176 (1968), the Court recited:

> The majority view in this country is represented by *Jenkins v General Accident Fire & Life Assur-*

---

[12] The United States Court of Appeals for the Sixth Circuit and the United States District Court for the Eastern District of Michigan have also relied on *Wakefield* in rendering decisions on this issue. See *Valentine v Liberty Mutual Ins Co,* 620 F2d 583 (CA 6, 1980); *Jones v Nat'l Emblem Ins Co,* 436 F Supp 1119 (ED Mich, 1977); *Noshey v American Automobile Ins Co,* 68 F2d 808 (CA 6, 1934).

*ance Corp,* 349 Mass 699 [703]; 212 NE2d 464, 467
(1965), which stated:

"Despite some conflict in earlier cases, the
weight of authority is that it is not necessary for
the insured to allege that he has paid or will pay a
judgment in excess of the policy limits in an action
against the insurer for breach of its duty to act in
good faith . . . ."[13] [Citations omitted.]

The court in *Purdy v Pacific Automobile Ins Co,*
157 Cal App 3d 59, 74; 203 Cal Rptr 524 (1984),

---

[13] The premise presented here was also discussed in 7C Appleman,
Insurance Law & Practice, § 4712, pp 426-430:

Many cases . . . were prone to make the test of possible
excess liability that of fraud or bad faith—that is, if the insurer
either fraudulently or in bad faith failed to effect a settlement
within the policy limits, it must discharge the full judgment
even in excess of those limits. If it was not so guilty, then
excess liability would not be imposed. To recover, the insured
must produce evidence of bad faith and [a] causal connection
between the bad faith and the damage sustained. The cause of
action arises when the insured is required to pay a judgment
that is in excess of his policy limits.

If the insurer did not fulfill his contractual obligation or was
guilty of bad faith or negligence in failing to negotiate and bring
about a settlement, the damage to the insured generally is the
amount for which the insured becomes charged in excess of his
policy coverage. [*Id.* at § 4711, p 414.]

For cases applying this theory, see *Smith v State Farm Mutual
Automobile Ins Co,* 278 F Supp 405 (ED Tenn, 1968); *Davis v Nat'l
Grange Ins Co,* 281 F Supp 998 (ED Va, 1968); *Shapiro v Allstate Ins
Co,* 44 FRD 429 (ED Pa, 1968); *Herges v Western Casualty & Surety
Co,* 408 F2d 1157 (CA 8, 1969) (bad faith); *Liberty Mutual Ins Co v
Davis,* 412 F2d 475 (CA 5, 1969) (failure to exercise good faith); *Bush v
Allstate Ins Co,* 425 F2d 393 (CA 5, 1970), cert den 400 US 833 (1970),
reh den 400 US 985 (1970); *Luke v American Family Mutual Ins Co,*
325 F Supp 1330 (D SD, 1971), judgment aff'd in part and rev'd in
part 476 F2d 1015 (CA 8, 1972) (under South Dakota law, an insur-
ance company may conduct itself in such a manner as to be held
liable for damages in excess of the policy limits); *United Services
Automobile Ass'n v Glens Falls Ins Co,* 350 F Supp 869 (D Conn, 1972)
(damages may extend to the entire amount of the judgment entered
against insured, even if it is in excess of policy limits).

expressed the deterioration of the minority viewpoint:

> The "prepayment rule" has in fact been relegated to the past in a majority of American jurisdictions, due primarily to the perceived inequity of an insurer's being permitted to capitalize on the weakened financial condition of the insured . . . . In California, damages in the amount of the excess judgment are, without further demonstration, the measure of recovery for bad faith failure to settle.

In *Dumas v State Farm Mutual Automobile Ins Co*, 111 NH 43, 45; 274 A2d 781 (1971), the New Hampshire Supreme Court reasoned that the prepayment rule could no longer be considered fair or judicious:

> A policy argument against our present rule is that it serves as a windfall to an insurer fortunate enough to have insured an insolvent. (Citation omitted.) In any event the statement that an insured has not been damaged because he cannot pay the excess judgment is based upon the fallacy that damaged credit and financial ruin are not injuries.[14]

---

[14] See also *Henegan v Merchants Mutual Ins Co*, 31 AD2d 12; 294 NYS2d 547 (1968); *Jenkins v General Accident, Fire & Life Assurance Corp, Ltd*, 349 Mass 699; 212 NE2d 464 (1965); *Brown v Guarantee Ins Co*, 155 Cal App 2d 679; 319 P2d 69 (1957); *Alabama Farm Bureau Mutual Casualty Ins Co v Dalrymple*, 270 Ala 119; 116 So 2d 924 (1959); *American Fire & Casualty Co v Davis*, 146 So 2d 615 (Fla App, 1962); *Wolfberg v Prudence Mutual Casualty Co*, 98 Ill App 2d 190; 240 NE2d 176 (1968); *Henke v Iowa Home Mutual Casualty Co*, 250 Iowa 1123; 97 NW2d 168 (1959); *Lange v Fidelity & Casualty Co of New York*, 290 Minn 61; 185 NW2d 881 (1971); *Gray v Nationwide Mutual Ins Co*, 422 Pa 500; 223 A2d 8 (1966); *Southern Fire & Casualty Co v Norris*, 35 Tenn App 657; 250 SW2d 785 (1952); *Hernandez v Great American Ins Co of New York*, 464 SW2d 91 (Tex, 1971); *Ammerman v Farmers Ins Exchange*, 22 Utah 2d 187; 450 P2d 460 (1969); *Harris v Standard Accident & Ins Co*, 191 F Supp 538 (SD NY, 1961); *Smoot v State Farm Mutual Automobile Ins Co*, 299 F2d 525 (CA 5, 1962); *Anderson v St Paul Mercury Indemnity Co*, 340 F2d 406 (CA 7, 1965); *Gaskill v Preferred Risk Mutual Ins Co*, 251 F Supp 66 (D Md, 1966).

Conversely, the United States Court of Appeals for the Second Circuit argued against the judgment rule and its accompanying theories in *Harris v Standard Accident & Ins Co,* 297 F2d 627 (CA 2, 1961). That court did not agree with the notion that insurers would receive a windfall upon a declaration of bankruptcy by its insured. The court opined that an insurer receiving premiums upon the face amount is subject to payment of that amount regardless of the insured's financial condition. Further, the court attempted to rebut the notion that adoption of the prepayment rule would make insurers less responsive to its duty to settle (because the insurer could avoid liability when its insured was insolvent), by stating that only a very small percentage of cases unfold with such factual parameters. Primarily, the court did not construe the risk or actual burden of paying an excess judgment as a result of an insurer's failure to settle as constituting actionable damages to the insured. Accordingly, the court declined to rule that the insurer was responsible for payment of an excess judgment. See also *Dumas v Hartford Accident & Indemnity Co,* 92 NH 140; 26 A2d 361 (1942); *Universal Automobile Ins Co v Culberson,* 126 Tex 282; 86 SW2d 727 (1935); *Seguros Tepeyac v Bostrom,* 347 F2d 168 (CA 5, 1965); *Smith v Transit Casualty Co,* 281 F Supp 661 (ED Tex, 1968).[15]

### III

### A

Insurance is an agreement whereby parties give

---

[15] *Dumas v Hartford Accident & Indemnity Co* was later overruled by *Dumas v State Farm Mutual Automobile Ins Co.* Further, *Universal, Seguros* and *Smith v Transit Casualty, supra,* appear to have been similarly outdated by *Hernandez v Great American Ins Co,* n 14 *supra.*

valuable consideration for protection from and indemnification against loss, damage, injury or liability. As servants of the public, insurance companies are held to the universally high standard of "good faith." See 7C Appleman, Insurance Law & Practice, § 4711. Anything less should not be tolerated. Accordingly, we adopt the rule which mandates that if an insurer engages in bad faith while failing to settle a claim, it must compensate the insured, regardless of financial status.

Although the prepayment rule allows for a recovery by the insured in instances of bad-faith failure to settle, the amount of the recovery is directly dependent upon the financial status of the insured, i.e., if an insured has no assets, the insurance company is not obligated to pay any part of an excess judgment. Thus, under this rule, an insurer is permitted to capitalize on the weakened financial condition of the insured. See *Purdy, supra.*

The major flaw in the prepayment rationale is the fact that when an insurer is "fortunate enough to have insured an insolvent," *Dumas, supra* at 45, there is no consequence for its deliberate failure to meet the good-faith standard. The judgment rule eliminates the insurer's ability to hide behind the financial status of its insured. Hence, adoption of the judgment rule is the most effective way to underscore our serious concern with bad-faith practices in the insurance industry.

B

We acknowledge that the potential injury to an insolvent insured is great. In the case at bar,

Charles Keeley earns a weekly salary of $150,[16] and is in no position to pay the $200,000 excess judgment against him. Despite the charge made in *Harris, supra,* that situations like the instant one are rare, Mr. Keeley's position is neither presently nor prospectively uncommon.

As noted previously, a minority of courts has asserted that an insured suffers no actionable damages when an insurer breaches its duty of good faith in settling claims. We, however, are in express agreement with the majority of jurisdictions that has held that an insured person with little or no assets suffers injury when an excess judgment is obtained against him. Such a judgment will potentially impair his credit, force him into bankruptcy, diminish his reputation, subject his outright property to lien, and immediately subject any future earnings to possible garnishment. See, generally, *Carter v Pioneer Mutual Casualty Co, supra.* Such injuries do constitute actual damages in the most traditional sense.[17]

An insurer cannot be allowed to flagrantly neglect the interests of its insured without facing serious consequences. There is, in this case, a direct cause and effect relationship between the bad-faith failure to settle and the entry of the excess judgment. Therefore, the insurer is responsible for paying the excess.

Worthy of reëmphasis is the premise set forth in *Wakefield* many years ago. When a liability in-

[16] In an affidavit dated March 10, 1985, Charles Keeley listed several statistics about himself in opposition to Frankenmuth's motion for summary disposition.

[17] Black's Law Dictionary (5th ed) defines damages as follows:

Damages. A pecuniary compensation or indemnity, which may be recovered in the courts by any person who has suffered loss, detriment, or injury, whether to his person, property, or rights, through the unlawful act or omission or negligence of another.

surer has sole power and control over the litigation of claims brought against its insured, which includes the obligation to compromise the claim if feasible, then counsel must proceed in good faith. This mandate of good faith does not encompass the notion that counsel should settle any and all claims, so that failure to do so is equivalent to bad faith, for

> "[i]t is not bad faith if counsel for the insurer refuse settlement under the bona fide belief that they might defeat the action, or, in any event, can probably keep the verdict within the policy limit. . . . A mistake of judgment is not bad faith." [*Wakefield, supra* at 656.]

However, upon the determination that an insurer failed to settle in deliberate bad faith,[18] such subterfuge cannot be rewarded by allowing the insurer to escape compensating its insured for this avoidable situation. Accordingly, as the measure of damages has been established by a majority of jurisdictions to be payment of the foreseeably resultant excess, we likewise adopt this judgment rule, as it serves to explain and extend previously existing precedent in our state.

IV

The appellee-insurer argues that this case should be governed by *Stockdale v Jamison,* 416 Mich 217; 330 NW2d 389 (1982). *Stockdale* involved an automobile accident between Mr. and Mrs. Stockdale and Wayne Jamison. Jamison was insured for $20,000 by Farm Bureau Insurance Group. The issue in the case involved whether the Stockdales could recover a $160,000 judgment from

---

[18] See n 10.

Jamison's insurance company, as a result of its failure to defend the claim on his behalf. The Court's principal holding was that "ordinarily an insurer's liability for breach of its contractual duty to defend its insured is limited to an amount equal to the insured's assets not exempt from legal process." *Id.* at 228. As a result, the plaintiffs were denied recovery of the excess judgment.

The concern with this case lies within n 15 of the opinion:

> Professor Keeton has suggested that this is an appropriate measure of damages for an insurer's breach of its duty to settle. Keeton [Insurance Law], § 7.8(f), p 516. As Professor Keeton points out, this approach has the advantage to both parties of eliminating the need for the insured (and consequently, the plaintiff) to suffer the costs of a bankruptcy proceeding in order to establish the actual amount of loss.
>
> See also *Harris v Standard Accident & Ins Co* [*supra*], (no recovery for bad faith failure to settle, where insured was insolvent before the entry of an excess judgment, and bankrupt afterwards); *Dumas v Hartford Accident & Indemnity Co* [*supra*], where the court said:
>
> "The mere existence of an outstanding judgment, which may never be paid, is not a legal injury, for the essence of the injury in such a case is pecuniary loss. *State Automobile Mutual Ins Co of Columbus, Ohio v York,* 104 F2d 730, 734 (CA 4, 1939). What the plaintiff owes may reduce the appearance of his net worth on an accountant's balance sheet, but unless he pays his debt he is not out of pocket."
>
> Professor Keeton did not discuss taking the same approach in the failure to defend context, possibly because he did not consider that an insurer might be liable above policy limits for a judgment against an insured who is unable to mitigate his damages by obtaining counsel. Keeton, *supra,* § 7.6(e), p 484. [*Stockdale, supra* at 228.]

The *Stockdale* Court's inclusion of this footnote was not intended to be a perch beneath which several decades of precedent were to fall.[19] The ampleness of Michigan case law preceding *Stockdale* on this issue makes clear this jurisdiction's preference for holding insurers liable for excess judgments in instances of bad-faith failure to settle.[20] *Stockdale* addressed an insurance company's failure to defend its insured, and any application of its findings should be applied solely to cases of failure to defend.[21]

---

[19] *Stockdale* was written to address the consequences of an insurance company's failure to defend its insured. Within the lead *Stockdale* opinion, as well as within its concurrence, a distinction was pointedly drawn between "failure to defend" and "failure to settle" cases:

> While good faith may limit an insurer's liability to policy limits in actions for failure to settle, it is not a defense to an action for breach of an insurer's obligation to defend its insured. The rule subjecting an insurer to liability to its insured in excess of policy limits for failure to act in good faith in settlement negotiations recognizes that where the insurer defends the action it has a substantial measure of control in the conduct of the lawsuit and is in a position to disregard the interests of the insured and expose him to the risk of a judgment in excess of policy limits. To protect the insured's interest, the courts have required that the insurer make reasonable efforts to settle within policy limits. [*Id.* at 223-224.]

Further, in Justice RYAN's concurrence:

> I agree with my brother that good faith or bad faith on the part of the insurance company is irrelevant in an action based on breach of the contractual duty to defend. In claiming that "good faith" is an absolute defense to liability in excess of the policy limits, the defendant Farm Bureau is confusing this case with cases alleging a bad faith refusal to settle. See *City of Wakefield v Globe Indemnity Co,* 246 Mich 645, 651; 225 NW 643 (1929). [*Id.* at 229.]

[20] See n 12 and accompanying text.

[21] Accordingly, to the extent that this opinion is inconsistent with *Sederholm v Michigan Mutual Ins Co,* 142 Mich App 372; 370 NW2d 357 (1985), it is overruled.

CONCLUSION

In adopting the judgment rule, we hold that when an insurer has exhibited bad faith in failing to settle a claim on behalf of its insured and a judgment in excess of the policy limits results, the insurer must pay the excess judgment in its entirety without regard to whether the insured has the capacity to pay. Accordingly, we reverse the holding of the Court of Appeals and remand the case to the trial court for a determination of damages in accordance with this opinion.

RILEY, C.J., concurred with ARCHER, J.

CAVANAGH, J. (*concurring*). I join in my Brother ARCHER's decision to apply the judgment rule in this case, but do not join its dicta rejecting that rule in the failure to defend context. In my view, our decision today and our decision in *Stockdale v Jamison,* 416 Mich 217; 330 NW2d 389 (1982), are incompatible.

BOYLE, J. (*concurring*). Although I concur in Justice ARCHER's decision to adopt, as a majority of jurisdictions have, the "judgment rule" of insurer liability where an insurer's bad-faith failure to settle a claim results in a judgment against an insured in excess of the policy limits, I write separately in order to emphasize the narrowness of this ruling.

I read Justice ARCHER's majority opinion as addressing only the question of the proper measure of damages recoverable once a claim of bad-faith failure to settle has been established. The opinion does not, as I understand it, pass upon the propriety of the trial court's finding in this case of bad faith on defendant's part, nor on the propriety

of the Court of Appeals affirmance of that finding.[1] Its failure to do so is the necessary result of our limited grant order in this case, which directed the parties to address only the question whether the trial court and Court of Appeals properly limited the nature and amount of damages available to Charles Keeley as counterplaintiff in this case. 430 Mich 857 (1988).

Thus, in my view the opinion should not be seen as establishing a new definition or standard of bad faith in such cases, nor, for that matter, as applying an existing definition or standard of bad faith. See, e.g., *Commercial Union Ins Co v Liberty Mutual Ins Co,* 426 Mich 127; 393 NW2d 161 (1986); *City of Wakefield v Globe Indemnity Co,* 246 Mich 645; 225 NW 643 (1929). The question whether bad faith was properly shown under these circumstances is simply not before this Court.[2]

I write also to express my agreement with Jus-

---

[1] I agree with Justice ARCHER that the trial court did make a finding of bad faith in this case. I also believe, despite Justice LEVIN's reservations on the issue, that the Court of Appeals *did* consider, and reject, defendant's argument on appeal that bad faith had not been established, since it not only upheld the award of attorney fees to Mrs. Keeley, but also remanded the case to the trial court for entry of judgment against defendant Frankenmuth "in an amount equal to Charles Keeley's assets not exempt from legal process." No such remand would have been necessary if the Court of Appeals had accepted the defendant's argument that plaintiff had failed to show bad faith.

While it is true, as Justice LEVIN observes, that the Court of Appeals treatment of the defendant's argument that bad faith was not shown is "cursory" at best, I would not, like Justice LEVIN, presume that the Court of Appeals therefore failed to fully consider the issue. Rather, we should engage in the presumption that, as a matter of procedure, the Court would not have answered the damages question at all if it had not first resolved for itself the question whether bad faith was properly shown to begin with. In this case, lack of bad faith was the defendant's "lead" argument; I cannot assume that the Court of Appeals simply missed the issue and reached a question which otherwise it would not have had to resolve.

[2] This is not to say, as Justice LEVIN apparently believes, that I am of the opinion that "there may have been clear error in finding . . . bad faith or inadequate evidentiary support for such a finding." *Post,* p 567. I am merely pointing out the obvious, i.e., that we reach only

tice ARCHER that today's decision is not, as Justice CAVANAGH states, necessarily "incompatible" with our decision in *Stockdale v Jamison,* 416 Mich 217; 330 NW2d 389 (1982). There are, as the majority aptly points out, a number of differences between "failure to defend" and "failure to settle" cases. This opinion should not be seen as affecting the continuing viability of the *Stockdale* rule with respect to failure to defend cases.

LEVIN, J. (*dissenting*). The question presented concerns the assessment of damages in an action against an insurer for refusing in "bad faith" to settle within policy limits.[1]

The Court of Appeals—on the authority of this Court's decision in *Stockdale v Jamison,* 416 Mich 217; 330 NW2d 389 (1982),[2] and its earlier decision, applying *Stockdale,* in *Sederholm v Michigan Mutual Ins Co,* 142 Mich App 372; 370 NW2d 357 (1985)—held that the "measure of damages in a breach of a duty to settle is limited to the assets of

the issue of damages in this case and do not address the merits of plaintiff's bad-faith claim, which the defendant challenged in the Court of Appeals—a challenge, again, that it undeniably lost—and with respect to which we did not grant leave to appeal.

[1] In *Wakefield v Globe Indemnity Co,* 246 Mich 645, 648; 225 NW 643 (1929), this Court said that an "insurer is liable to the insured for an excess of judgment over the face of the policy when the insurer, having exclusive control of settlement, fraudulently or in bad faith refuses to compromise a claim within the policy limit."

Similarly, see *Commercial Union Ins Co v Medical Protective Co,* 426 Mich 109, 116; 393 NW2d 479 (1986) (WILLIAMS, C.J.), so stating on the authority of *Wakefield,* where it was added that the "cause of action" originates in the implied covenant of good faith and fair dealing that arises from the contract between the insurer and the insured.

[2] In *Stockdale,* the plaintiff obtained a judgment in a tort action for an amount in excess of policy limits and then obtained an assignment of the insured's claim against his insurer for failing to defend the tort action. The insured appeared to be judgment proof. This Court held that the plaintiff could recover from the insurer the amount he could actually have recovered from the insured, which amount ordinarily "is limited to an amount equal to the insured's assets not exempt from legal process." *Id.,* p 228.

the assignor not exempt from legal process," and remanded for a determination of the extent of the assets of Charles Keeley not exempt from legal process.[3]

The majority would limit *Stockdale* to a case, such as *Stockdale,* of a failure to defend and would not extend or apply the principle there stated to a case where, as here, it is alleged that the insurer refused in bad faith to settle. We would apply *Stockdale* in this failure-to-settle case.

I

Charles Keeley pointed a shotgun at Joey Guy Boone and pulled the trigger. Boone was rendered quadriplegic.

Keeley was an insured under a homeowner's insurance policy issued by Frankenmuth to his mother, Wilma Jean Keeley. The policy provided coverage for bodily injury except "bodily injury or property damage which is either expected or intended from the standpoint of the Insured" with a limit of $50,000.[4] Frankenmuth asserted that the exception from coverage was applicable.

A lawyer retained by Mrs. Keeley to represent her son in criminal proceedings[5] resulting from the incident and a lawyer retained by Boone to pursue his personal injury claim demanded that Frankenmuth tender the policy limits to settle Boone's claim. Boone's lawyer wrote Keeley's lawyer and Frankenmuth advising that unless policy limits were tendered by December 1, 1978, a tort "suit will be filed against the Keeleys and my clients

---

[3] *Frankenmuth Mutual Ins Co v Keeley,* unpublished opinion per curiam of the Court of Appeals, decided August 19, 1987 (Docket No. 89615). See excerpt from opinion attached as an appendix.

[4] See *Allstate v Freeman,* 432 Mich 656; 443 NW2d 734 (1989).

[5] Keeley was bound over on an assault charge, and pled guilty of a lesser offense.

will seek their full measure of damages and will not feel bound by the limits of the liability policy held with [Frankenmuth] and will look to any and all holdings of the Keeleys to satisfy any resulting Judgment."

Frankenmuth responded offering to settle for $20,000 and indicated that if the offer was rejected it would file a declaratory judgment action regarding the coverage dispute. The offer was rejected.

A tort action was commenced against Keeley on December 22, 1978.[6] Frankenmuth offered to settle for $25,000 on January 18, 1979, but that offer was rejected.[7] Frankenmuth provided a defense for Keeley under a reservation of rights.

Frankenmuth commenced an action on June 8, 1979, for a declaratory judgment against Keeley and Boone. The defendants filed a counterclaim against Frankenmuth for bad-faith failure to settle.

There were thus three separate claims: the tort action against Keeley, the declaratory judgment action against Keeley and Boone, and the bad-faith claim against Frankenmuth.

The first action to be tried was the declaratory judgment action. Following a bench trial on July 6, 1981, the judge entered an order finding that there was coverage. The judge said that he was satisfied that Keeley intentionally pointed the shotgun at Boone and pulled the trigger, but Frankenmuth had "failed to bear the burden of

---

[6] Mrs. Keeley was also named as a defendant. Negligent parental supervision was claimed. That claim was dismissed before trial.

[7] The letter rejecting the offer indicated that Boone's lawyer was under the impression that the policy limits were $25,000:

As my clients indicated they would, they have withdrawn their offer to settle the case within the Keeleys' policy limits of $25,000.

proof of showing that he intended the result," and found that there was coverage.

The judge denied a request for attorney fees[8] stating that there were disputed "questions of fact upon which reasonable minds could differ."

On July 2, 1981, Frankenmuth offered the policy limits of $50,000, but this offer was rejected. Frankenmuth filed an offer of judgment on September 2, 1981, for $50,000 plus all taxable interest and costs to date, which was rejected. Frankenmuth accepted in behalf of Keeley, but Boone rejected the October, 1981 offer, a mediation valuation of $50,000.

The tort action came to trial in mid-1982, nine months after Frankenmuth had filed the offer of judgment. The jury found that Boone had suffered damages of $500,000, but that he was fifty percent comparatively negligent. A judgment was entered against Keeley for $250,000 plus prejudgment interest to the date of the verdict in the amount of $84,890. Frankenmuth tendered $66,978 in partial payment of the judgment—the policy limits of $50,000 and interest of $16,978.

After the tort action had been tried to verdict, the Keeleys and Boone entered into an agreement concerning Keeley's bad-faith claim against Frankenmuth. The lawyer representing Keeley in the instant appeal was substituted as counsel for both Boone and Keeley. Boone agreed to forbear any action to collect on the judgment he had obtained against Keeley. Keeley agreed to pay Boone sums recovered on the claim. Boone was authorized to accept or reject any settlement offer made by Frankenmuth and any settlement would be apportioned ninety-five percent to Boone and five percent to the Keeleys.

---

[8] The request was based on GCR 1963, 111.6.

Before trying the bad-faith claim, the court entered an order on June 20, 1985, granting Frankenmuth's motion for summary judgment respecting all items of damages claimed by the Keeleys except attorney fees incurred by Mrs. Keeley. The ruling was based on this Court's decisions in *Stockdale* and *Kewin v Massachusetts Mutual Life Ins Co,* 409 Mich 401; 292 NW2d 50 (1980). The court found on December 3, 1985, that there was a question of fact on which reasonable minds could differ concerning *attorney fees* Mrs. Keeley claimed were incurred as a result of "alleged bad faith" on the part of Frankenmuth in handling Boone's claim.

At a hearing on December 6, 1985, the judge found that Frankenmuth's handling of the case had inadequately protected Mrs. Keeley's interest and was in bad faith, with the result that she had incurred legal expenses that she would not have otherwise incurred. The offer of judgment in the amount of $50,000 plus interest was, said the judge, "too late to save *costs.*" (Emphasis added.) A judgment was entered for $4,152 plus interest in respect to the attorney fees incurred by Mrs. Keeley.[9]

---

[9] The judge stated at the conclusion of the hearing on December 6, 1985:

I find it absolutely improper for [Frankenmuth's lawyer] as late as 4/23/80 talking about giving advice to the insurance company, almost acting as the insurance company attorney, when he owed a duty to the insured. That's where we get into the factor that the courts talk about of that fiduciary relationship between the insurance company and the insured.

\* \* \*

It's quite apparent to the Court throughout this that the insurance company and [the lawyer] were not keeping that relationship separate. It's quite apparent that [the lawyer] was serving two masters in essence.

\* \* \*

It appears that there is a substantial question whether the judge found, or would find, that there was a causal relationship between the bad-faith conduct that he found in the handling of the claim and the loss claimed by Keeley resulting from the entry of the judgment in the amount of $250,000. Frankenmuth asserts that the judgment of $4,152 was for "the only damage which actually flowed from the bad faith conduct found by that Court. It found that Frankenmuth's attorney's failure to properly delineate his role had caused Franken-

But there was bad faith in this failure to delineate the relationship that [the lawyer] had to Frankenmuth Insurance Company once he was representing Wilma Keeley. And, the Court is satisfied that that as much as anything is bad faith. And, that's the primary basis. The Court has mentioned others.

The Court does tend to feel that the insurance company was not acting in good faith in its negotiations. But that, again, is an issue that is very close. There is always on the part of an insurance company, and rightly so, a need to try to avoid paying out anymore [sic] than necessary. That's a whole part of the game of lawsuits and who pays out what.

So I say that is an example. But the Court thinks they waited too little too late. Even—the first time really that the Court finds that the insurance company did finally come through was frankly after mediation and they accepted the mediation award. But in between times it was apparent to the Court that there was really a lack of real effort on the part of the insurance company to settle this matter and to avoid the fees which in fact Mrs. Keeley did incur.

But the primary issue, the one that bothers the Court the most and the one that the Court basically feels shows the bad faith, is that failure to delineate the relationship between [the lawyer] as to whether he was attorney for the insurance company or whether he was the attorney for Mrs. Keeley. And, that failure to delineate that, and for him to be giving advice to the company for the company to use his investigator, most of it aimed at trying to find a basis really for avoiding liability on the policy in the Court's opinion is the bad faith. And, that's the primary basis upon which the Court does make the finding that it has already indicated: that the insurance company is liable for the attorney fees incurred by Mrs. Keeley as a matter of contract, that should have been covered by contract, and yet she was put to that expense because of that failure to protect her otherwise.

So counter-plaintiff may have a judgment as the Court noted, $4,152.

muth's insured, Wilma Jean Keeley, to incur expense in securing the representation of a second defense attorney.[10] That expense was the damage caused by the particular breach, and it was awarded. However, the excess judgment was not causally related to, and did not naturally flow from, the particular breach of the insurance contract involved in this case."

Keeley asserts that Frankenmuth did not raise those contentions in the Court of Appeals.[11] On appeal in the Court of Appeals, Frankenmuth did, however, argue that the evidence did not establish bad faith.[12] The Court of Appeals did not reach that question.

It is unclear whether the judge found bad faith in failing to offer policy limits before the declaratory judgment action was decided against Frankenmuth. The judge's findings on the earlier attorney fees issue[13] suggests that he might not have found bad faith in failing to offer policy limits before they were offered. The judge might have thought that he had no need to decide at the December 6, 1985, hearing whether the failure to offer policy limits earlier was of any importance because he had already decided, on June 20, 1985, that *Stockdale* and *Kewin* precluded any recovery other than the amount that he ultimately awarded for unnecessarily incurred attorney fees.

---

[10] The "second defense attorney" was the same lawyer who was retained by Mrs. Keeley to represent her son in criminal proceedings.

[11] Frankenmuth's brief in the Court of Appeals, however, stated:

It is unclear whether the trial court found a bad faith on the part of FMIC in its duty to defend, or its duty to settle.

[12] Frankenmuth was not required to file a cross appeal in order to assert that the judgment of the trial court should be affirmed because there was no bad faith. It appears, however, that Frankenmuth did file a cross appeal on February 19, 1986.

[13] See n 8 and accompanying text.

We would remand the cause to the trial judge for a determination of whether there was bad faith in failing to offer policy limits before the judge rendered his decision in the declaratory judgment action.[14]

II

We agree with the majority that the prepayment rule, requiring an insured to have made some payment on the judgment, is unsound and that the judgment rule is in general the better approach.[15] An insured should not be required to

[14] The letter adverted to in the lead opinion does not negate the apparent legitimacy of the coverage question. The letter indicates an opinion of an adjustor. That did not constitute an admission by Frankenmuth that there was no coverage issue.

[15] In the following failure-to-settle cases, the courts adopted the judgment rule, but there is no indication whether the insured was solvent. *Noshey v American Automobile Ins Co,* 68 F2d 808 (CA 6, 1934); *Jones v Nat'l Emblem Ins Co,* 436 F Supp 1119 (ED Mich, 1977); *Hernandez v Great American Ins Co of New York,* 464 SW2d 91 (Tex, 1971); *Thompson v Commercial Union Ins Co of New York,* 250 So 2d 259 (Fla, 1971); *Bennett v Conrady,* 180 Kan 485; 305 P2d 823 (1957); *Foundation Reserve Ins Co v Kelly,* 388 F2d 528 (CA 10, 1968); *Southern Farm Bureau Casualty Ins Co v Mitchell,* 312 F2d 485 (CA 8, 1963); *Shapiro v Allstate Ins Co,* 44 FRD 429 (Pa, 1968); *Smith v State Farm Mutual Automobile Ins Co,* 278 F Supp 405 (ED Tenn, 1968); *Terrell v Western Casualty & Surety Co,* 427 SW2d 825 (Ky, 1968); *United States Fidelity & Guaranty Co v Evans,* 223 Ga 789; 158 SE2d 243 (1967); *Luke v American Family Mutual Ins Co,* 476 F2d 1015 (CA 8, 1972). Because the issue which divides us is how the judgment rule should be applied where the insured is not able to pay the amount of the judgment, the foregoing cases are not in point.

In the following failure-to-settle cases, where the courts adopted the judgment rule, there is some discussion of the solvency of the insured or whether the insured had or would be able to pay all or part of the judgment. *American Fire & Casualty Co v Davis,* 146 So 2d 615 (Fla App, 1962); *Carter v Pioneer Mutual Casualty Co,* 67 Ohio St 2d 146; 423 NE2d 188 (1981); *Purdy v Pacific Automobile Ins Co,* 157 Cal App 3d 59; 203 Cal Rptr 524 (1984); *Dumas v State Farm Mutual Automobile Ins Co,* 111 NH 43; 274 A2d 781 (1971); *Lange v Fidelity & Casualty Co of NY,* 290 Minn 61; 185 NW2d 881 (1971); *Sweeten v Nat'l Mutual Ins Co of DC,* 233 Md 52; 194 A2d 817 (1963); *Brown v Guarantee Ins Co,* 155 Cal App 2d 679; 319 P2d 69 (1957); *Gray v Nationwide Mutual Ins Co,* 422 Pa 500; 223 A2d 8 (1966); *Henke v Iowa Home Mutual Casualty Co,* 250 Iowa 1123; 97 NW2d 168 (1959);

sell assets or borrow money to pay a judgment in order to maintain an action against the insurer for bad faith in failing to settle a claim within policy limits.

Adoption of the judgment rule approach does not, however, justify eliminating the sense of the prepayment rule that the insurer should not be required to pay more than the insured is able to pay on the judgment. We agree with Chief Judge Fuld of the New York Court of Appeals who said:

> I do not suggest—although there are a number of decisions so holding—that an insured must pay the judgment before he, or another on his behalf, is able to proceed against a bad faith insurer. *However, there must be some showing that he has been damaged.* In the case before us, there is not the slightest evidence, or even intimation, that the insured was harmed by the judgment, that he had any assets which were imperiled or that either his reputation or credit was impaired.
>
> In short, the complaint in this case should be dismissed not only because there is no evidence that the insurer acted in bad faith but also because there is no proof that the insured suffered any damage. [*Gordon v Nationwide Mutual Ins Co,* 30 NY2d 427, 441; 285 NE2d 849 (1972). Emphasis added.][16]

---

*DiMarzo v American Mutual Ins Co,* 389 Mass 85; 449 NE2d 1189 (1983); *Wooten v Central Mutual Ins Co,* 182 So 2d 146 (La, 1966); *Chitty v State Farm Mutual Automobile Ins Co,* 38 FRD 37 (ED SC, 1965); *Andrews v Central Surety Ins Co,* 271 F Supp 814 (D SC, 1967); *Farmers Ins Exchange v Schropp,* 222 Kan 612; 567 P2d 1359 (1977); *Lee v Nationwide Mutual Ins Co,* 286 F2d 295 (CA 4, 1961); *Anderson v St Paul Mercury Indemnity Co,* 340 F2d 406 (CA 7, 1965); *Southern Fire & Casualty Co v Norris,* 35 Tenn App 657; 250 SW2d 785 (1952); *Harris v Standard Accident & Ins Co,* 191 F Supp 538 (SD NY, 1961); *Ammerman v Farmers Ins Exchange,* 22 Utah 2d 187; 450 P2d 469 (1969); *Smoot v State Farm Mutual Automobile Ins Co,* 299 F2d 525 (CA 5, 1962). Because there is some discussion of the solvency-of-the-insured question in these cases, they are in point. In most, however, there is little or no discussion, inadequate analysis, and no discussion, in any of them, of alternatives such as those adverted to in part III of this opinion.

16 See also *Levantino v Ins Co of North America,* 102 Misc 2d 77;

Judge Keeton has expressed the following view:

> When it seems almost certain the insured will never pay anything at all on the excess judgment if the claim against the insurer is denied, *arguments that the insured has been damaged by the increase in debts are rather weak support for any cause of action at all, much less for a measure of damages equal to the amount of the increase in the insured's debts.* However, other courts have concluded that the entry of judgment against a person constitutes a loss and that the insured's "loss does not turn on whether the judgment has been satisfied." Since, absent a discharge of the obligation through a bankruptcy proceeding, the third party's judgment can remain as an outstanding obligation for extended periods of time, in many circumstances there is considerable uncertainty in regard to predicting whether the insured may ultimately have resources or assets that may be taken to satisfy some portion of the judgment.

Third party claimants are not in a position to assert that they were harmed as a result of the insurer's conduct in regard to having not settled

---

422 NYS2d 995 (1979), where the court declared that in ascertaining damages when the insured pays part of the judgment or is solvent at the time of the judgment, the judgment rule applies and he is entitled to the full amount of the excess as his damages; where he was insolvent before the judgment and obtained a discharge in bankruptcy thereafter, he is not damaged and may not recover; and where he was insolvent or nearly insolvent prior to judgment, the jury must consider his past, his prospects, and other economic factors and assess his damages.

Similarly see *Anderson,* n 15 *supra,* where the United States Court of Appeals for the Seventh Circuit held that because an insured was solvent before judgment was entered, he could recover the full amount of the judgment in excess of policy limits from an insurer who in bad faith failed to settle. See also *Gregersen v Aetna Casualty & Surety Co,* 241 F Supp 204 (SD NY, 1964).

Other cases hold that an insurer did not act in bad faith in refusing to settle when the insurer knew that the insured was insolvent. Since the insured would suffer no harm, there was no reason to allow the insured or an assignee of the insured to recover in excess of the policy limit from the insurer. See *Bourget v Government Employees Ins Co,* 456 F2d 282 (CA 2, 1972); *Shapero v Allstate Ins Co,* 14 Cal App 3d 433; 92 Cal Rptr 244 (1971).

the tort claim. *The insurer's duty was to the insured, not to the claimant.* Furthermore, in one sense, a third party benefits from the insurer's refusal to settle because the insurer's refusal to settle resulted in the claimant's obtaining a judgment in excess of the amount the claimant had offered to accept in settlement. Thus, although the third party claimant deserves further compensation, the theoretical justification for imposing liability on the insurer, which is harm to the insured, *does not warrant a recovery by such a claimant any more than the innocent victims of an underinsured tortfeasor would be entitled to indemnification beyond the amount of the applicable coverage from a liability insurer who had not refused a settlement.* [Keeton & Widiss, Insurance Law, § 7.8(i)(1), pp 899-900. Emphasis added.]

The majority would hold that Frankenmuth is liable for the $200,000 excess of the judgment over policy limits—now, with interest, over $600,000—"without regard to whether the insured has the capacity to pay"[17] and thus without any evidence or finding that Keeley suffered pecuniary loss in that amount. The stated rationale in the lead opinion is that this will "underscore our serious concern with bad-faith practices in the insurance industry."[18]

Until now, the rule in Michigan has been that the action for bad-faith failure to settle sounds in

---

[17] *Ante,* p 528.

[18] *Ante,* p 539.
The lead opinion also states that "[a]nything less [than conformance by insurance companies to the duty 'as servants of the public' to observe the 'high standard of "good faith"'] should not be tolerated." (*Ante,* p 539.) The lead opinion asserts that the rule it would adopt "eliminates the insurer's ability to hide behind the financial status of its insured. Hence, adoption of the judgment rule is the most effective way to underscore our serious concern with bad-faith practices in the insurance industry." (*Ante,* p 539.) Also: "An insurer cannot be allowed to flagrantly neglect the interests of its insured without facing serious consequences." (*Ante,* p 540.)

contract and not in tort.[19] Contract damages seek
to place the aggrieved party in the same *economic*
position he would have been had the contract been
performed.[20] It is well established that as a general
rule no damages will be awarded for the mental
distress or emotional trauma that may be caused
by breach of contract.[21]

The "system of contract remedies" is not di-
rected at compulsion of promisors to perform, its
aim rather is relief to promisees to redress breach.
The objective is not to cause promisors to perform,
but rather to encourage promisees to rely on
promises, and this is done by securing the "expec-
tation interest"[22] through awarding damages for

[19] Cf. *Commercial Union Ins Co v Medical Protective Co*, n 1 *supra*.

[20] For breach of contract the law of damages seeks to place the
aggrieved party in the same *economic* position he would have
had if the contract had been performed. This involves an award
of both the "losses caused and gains prevented by the defen-
dant's breach, in excess of savings made possible." [Calamari &
Perillo, Contracts (3d ed), § 14-4, p 591. Emphasis added.]

The duty to keep a contract at common law means a predic-
tion that you must pay damages if you do not keep it,—and
nothing else. [Holmes, *The path of the law,* 10 Harv L R 457,
462 (1897).]

[21] It is well established that, as a general rule, no damages will
be awarded for the mental distress or emotional trauma that
may be caused by a breach of contract. While some courts have
concluded that this result is reached because such damages are
too remote to have been within the contemplation of the
parties, it seems apparent that the courts have forged "a rule
of policy defining the limits of business risk." [Calamari &
Perillo, Contracts (3d ed), § 14-5, p 596.]

[22] Subject to limitations stated in §§ 350-53, the injured party
has a right to damages based on his *expectation interest* as
measured by
(a) the loss in the value to him of the other party's perfor-
mance caused by its failure or deficiency, plus
(b) any other loss, including incidental or consequential loss,
caused by the breach, less
(c) any cost or other loss that he has avoided by not having to
perform.

the *economic* loss suffered by the promisee.[23]

As stated in the lead opinion, the Supreme
Court of New Hampshire reasoned that the pre-
payment rule could no longer be considered fair or

Comment: . . . Contract damages are ordinarily based on the
injured party's *expectation interest* and are intended to give
him the benefit of his bargain by awarding him a sum of money
that will, to the extent possible, put him in as good a position
as he would have been in had the contract been performed. [3
Restatement Contracts, 2d, § 347, p 112. Emphasis added.]

[23] See n 20.

[O]ur system of contract remedies rejects, for the most part,
compulsion of the promisor as a goal. It does not impose
criminal penalties on one who refuses to perform his promise,
nor does it generally require him to pay punitive damages. Our
system of contract remedies is not directed at *compulsion* of
*promisors* to *prevent* breach; it is aimed, instead, at *relief* to
*promisees* to *redress* breach. Its preoccupation is not with the
question: how can promisors be made to keep their promises?
Its concern is with a different question: how can people be
encouraged to deal with those who make promises? . . .

How do courts encourage promisees to rely on promises?
Ordinarily they do so by protecting the expectation that the
injured party had when he made the contract by attempting to
put him in as good a position as he would have been in had the
contract been performed, that is, had there been no breach.
The interest measured in this way is called the *expectation
interest* and is said to give the injured party the "benefit of the
bargain." The expectation interest is based not on the injured
party's hopes at the time he made the contract, but on the
*actual value that the contract would have had to him had it
been performed.* [Farnsworth, Contracts, § 12.1, pp 812-813.
Emphasis added.]

The basic principle for the measurement of those damages is
that of compensation based on the injured party's expectation.
He is entitled to recover an amount that will put him in as
good a position as he would have been in had the contract been
performed. At least in principle, *a party's expectation is mea-
sured by the actual worth that performance of the contract
would have had to him, not the worth that it might have had
to some hypothetical reasonable person.* Damages based on
expectation should therefore take account of any circumstances
peculiar to the situation of the injured party, including his own
needs and opportunities, his personal values, and even his
idiosyncracies. . . . [*Id.,* § 12.8, p 839. Emphasis added.]

just because "it serves as a windfall to an insurer fortunate enough to have insured an insolvent," and the concept that an insured has not been damaged because he cannot pay the excess judgment is based on the fallacy that damaged credit and financial ruin are not injuries. *Dumas v State Farm Mutual Automobile Ins Co,* 111 NH 43, 45; 274 A2d 781 (1971).

Damaged credit and financial ruin are, we agree, economic loss and compensable. If Keeley could demonstrate that his credit had been damaged or he had suffered financial ruin, then he should no doubt recover for such economic loss caused by breach of contract. It does not appear on this record, however, that Keeley's credit has been damaged to the extent of over $600,000.

There should not be any concern about a so-called windfall to an insurer. Contract damages are generally measured by the loss to the promisee, not the loss or gain to some other person.[24]

In Michigan, in contrast with a number of other states, damages in contract (and also in tort) are compensatory. In other states, mental distress and punitive damages are recoverable.[25] In those legal climates, concerns about windfalls to insurers and insurance industry practices have led the courts to

---

[24] The general measure of damages can therefore be expressed in terms of these four effects, two of which (*loss in value* and *other loss*) are adverse to the injured party and therefore increase his damages, and two of which (*cost avoided* and *loss avoided*) are beneficial to him and therefore decrease his damages. [Farnsworth, Contracts, § 12.9, pp 847-848. Emphasis in the original.]

[25] See *Larraburu Bros Inc v Royal Indemnity Co,* 604 F2d 1208 (CA 9, 1979); *Gibson v Western Fire Ins Co,* 682 P2d 725 (Mont, 1984); *Commercial Union Ins Co v Ford Motor Co,* 599 F Supp 1271 (ND Cal, 1984); *United Services Automobile Ass'n v Glens Falls Ins Co,* 350 F Supp 869 (D Conn, 1972); *Murphy v Allstate Ins Co,* 17 Cal 3d 937; 132 Cal Rptr 424; 553 P2d 584 (1976); *Campbell v Government Employees Ins Co,* 306 So 2d 525 (Fla, 1975).

ignore the difference between the measure of damages in a contract action and in a tort action, and to allow recovery for mental distress and punitive damages for bad-faith failure to settle.[26]

Although not expressly stated in the lead opinion, since the over $600,000 recovery is awarded without proof that Keeley incurred economic loss, this Court will for the first time have departed from the principle of confining the damages for breach of contract by an insurer to the economic loss suffered by the promisee.

In *Kewin v Massachusetts Mutual Life Ins Co,* 409 Mich 401, 421; 295 NW2d 50 (1980), this Court declined to recognize an action for bad-faith breach of an insurance indemnity contract and ruled that "absent allegation and proof of tortious conduct existing independent of the breach, . . . exemplary damages may not be awarded in common-law actions brought for breach of a commercial contract."

In *Friedman v Dozorc,* 412 Mich 1; 312 NW2d 585 (1981), this Court declined to expand the tort remedy of malicious prosecution by eliminating the special injury requirement in a countersuit commenced by physicians against lawyers who had previously unsuccessfully brought a malpractice action against them.

In *Roberts v Auto-Owners Ins Co,* 422 Mich 594; 374 NW2d 905 (1985), this Court reversed a judgment for mental distress damages of $2,500 awarded for outrageous claims processing, stating that the threshold requirements of proof to make out a prima facie case of intentional infliction of

---

[26] *Id.*

In *Valentine v General American Credit, Inc,* 420 Mich 256, 261; 362 NW2d 628 (1984), this Court declared that mental distress damages were not recoverable in an action for breach of employment contract, although the denial of such damages would "leave the plaintiff with less than full recovery . . . ."

emotional stress had not been established, and declined to address the question whether the tort of intentional infliction of emotional distress would be recognized in the insurance claims processing or other contexts.

In *Commercial Union Ins Co v Medical Protective Co,* 426 Mich 109, 126; 393 NW2d 479 (1986), this Court held that a primary insurer did not owe a duty to an excess insurer to act in good faith to settle a claim against the insured and that the excess insurer's cause of action against the primary insurer is as an equitable subrogee of the insured. In so holding, a majority declined to join in footnote 5 of the lead opinion, which indicated that there might be a direct duty of good faith and due care "from a primary insurer toward an excess insurer"—and, on that analysis, possibly to an injured person such as Boone. In so holding, the majority stated that there was "no convincing legal precedent or reasoning and no policy considerations which would lead [the majority] to determine that such an expansion of traditional tort doctrine is appropriate in these circumstances."

In *Young v Michigan Mutual Ins Co,* 139 Mich App 600, 606; 362 NW2d 844 (1984), the Court of Appeals ruled that the Uniform Trade Practices Act, requiring timely payment of claims to insureds and designating certain activities to be unfair competition or unfair or deceptive acts or practices, did not provide a private cause of action in tort for violation of the provisions of the act, and said:

> Plaintiff also claimed that a private cause of action is implied by MCL 500.2026; MSA 24.12026. This claim was rejected by the Michigan Supreme Court in *Shavers v Attorney General,* 402 Mich 554, 604, n 27; 267 NW2d 72 (1978), cert den sub

nom *Allstate v Kelley,* 442 US 934; 99 S Ct 2869; 61 L Ed 2d 303 (1979). The Michigan Supreme Court noted that isolated incidents do not constitute unfair trade practices under MCL 500.2026; MSA 24.12026, MCL 500.2027; MSA 24.12027. There can be no independent cause of action in a particular insurance client since an insurance client's dealings with an insurance company are of necessity an isolated incident. MCL 500.2026; MSA 24.12026 is designed to give the Commissioner of Insurance authority over certain continuing practices of insurance companies. See MCL 500.2028 *et seq.*; MSA 24.12028 *et seq.* The insured does not have an independent cause of action under MCL 500.2026; MSA 24.12026.

Upon adoption of the majority view, counsel for plaintiffs could argue that Michigan no longer restricts plaintiffs claiming bad-faith settlement practices to recovery of pecuniary loss and has recognized a kind of hybrid cause of action sounding in contract, but actually allowing recovery of losses akin to punitive damages.

III

We would accept the judgment rule insofar as it dispenses with the need to establish that Keeley paid any amount on the judgment and would, as did the Court of Appeals, remand to the trial court for a determination of the extent of Keeley's assets not exempt from legal process[27] and, additionally,

---

[27] Judge Keeton suggested that the injured person's recovery be limited to "an amount equal to the insured's net assets which are not exempt from legal process." While we would not so limit the injured person's recovery, we otherwise agree with his analysis:

(4) Comment: Liability to the Extent of a Solvent Insured's Net Assets

It should be possible to formulate a workable doctrine (1) that fully protects the insured from loss, (2) that does not result

in eliminating the "penalty" on the insurer, and (3) that does not produce a "windfall" for the third party claimant. One of the reasons that such a solution has not been developed probably is that opposing advocates have generally chosen to advance the more extreme positions, rather than intermediate positions that would involve a more limited measure of damages that would conform to such a doctrine or theory of liability. On the one hand, counsel for the third party claimants—pressing the insured's cause of action either in the insured's name or in the name of the claimant as assignee or successor to the insured's right—have sought to establish liability to the full extent of the excess judgment, regardless of the insured's financial status. On the other hand, counsel for insurers have generally attempted to establish that proof of the amount paid or of the certainty (or at least reasonable probability) of an amount of future payment is essential to the cause of action.

The appropriate measure of damages, when an insured is entitled to a recovery that is in excess of the applicable liability insurance policy limits, should be the amount needed to make the insured whole by placing the insured in the same position that would have existed had there been no breach of the duty to settle. Furthermore, this sum should be established after taking into account the amount, if any, that the third party claimant could have realized upon rights against the insured if there had been no cause of action for liability in excess of policy limits—that is, after taking into account how much could have been recovered above the insurance policy limits against an insured who had some assets, but not enough that the third party could recover more than could have been recovered against the insured. *This might be done by permitting a single recovery against the insurer on the excess liability claim, at the instance of either the insured or the third party claimant, in an amount equal to the insured's net assets which are not exempt from legal process, and holding that the claimant's tort judgment against the insured is fully discharged by payment of this sum to the claimant either by the insured or by the insurer on the insured's behalf.* Although in some instances this amount may be somewhat more than the net recovery the claimant would otherwise have realized (apart from the excess liability claim) *this approach* certainly more closely approximates that recovery and it *provides full protection of the insured's financial position from the consequences of the insurer's wrong to the insured in failing to settle.*

The financial interests of both the insured and the third party claimant are better served by the solution proposed in the preceding paragraph than by leaving them to other legal processes, such as a bankruptcy proceeding, the cost of which would have an adverse impact on the interests of each. This proposal may not be fully within the scope of avoidable consequences rules as thus far developed, because decisions applying this concept have been concerned with mitigating damages in a

for a determination of the value of the excess portion of the judgment—now over $600,000 including accrued interest plus additional interest as it accrues—taking into account not only Keeley's assets not exempt from legal process but also his

different sense. However, it is within the scope of the principle underlying the avoidable consequences rule: the principle that even though a person can show that in fact losses have been greater, legal relief is limited to what that person would have been entitled to receive if reasonable actions had been taken to minimize the harm.

Even though a claimant's tort claim has already been reduced to judgment, the underlying spirit of exemption and bankruptcy laws expresses a public policy that there should be a reasonable limitation on the hardship the claimant is permitted to impose by strict enforcement of the judgment. In this context, the availability of a cause of action against the insurer in excess of its policy limits offers a distinctive opportunity— not generally existing in other settings involving judgment creditors—for achieving at least as much as could be attained for the claimant through enforcement of the judgment as far as the exemption and bankruptcy laws would permit, but without incurring the costs of bankruptcy to the claimant himself and to the insured. It seems consistent with the principles underlying both the avoidable consequences doctrine, the exemption rules, specifically, and the bankruptcy laws, generally, to adopt this intermediate measure of damages in excess liability claims.

The application of this measure of damages may present problems of proof not heretofore faced, but they should be manageable. For example, the insurer should have the right to offer satisfactory evidence on these issues if it can, shouldering the burden as one customarily does in advancing an avoidable consequences defense.

The implementation of this approach requires that the insured suffer a loss of privacy because of the necessity for a complete disclosure of the insured's financial situation. This is, however, a consequence to which the insured has contributed by committing a tort against the claimant that caused damages of such severity that the limited amount of liability insurance coverage, chosen by the insured, was inadequate. The loss of privacy in this context is a burden that it seems both reasonable and justifiable for the insured to bear.

The only realistic alternative to such an intermediate solution is to set the measure of damages in these cases at the full amount of the judgment, a solution that would disadvantage the insured and others like the insured by increasing the costs of low-limit liability insurance. [Keeton & Widiss, Insurance Law, § 7.8(i)(4), pp 903-905. Emphasis added.]

prospects of attaining in the future additional assets from which the judgment could be collected.[28]

We thus propose a compromise between the prepayment and the judgment rule: that this Court accept the essence of the judgment rule by eliminating the need to show partial payment, but provide protection for insurers along the lines of the prepayment rule by precluding collection on the judgment from the insurer beyond what is or would actually be collectable from the insured.

### IV

Frankenmuth was prepared to settle Keeley's claim for policy limits nine months before trial and offered to have a judgment entered for that amount plus interest. That offer was declined in the hope that a greater judgment would be awarded, and that a sympathetic judge or jury would find bad faith in Frankenmuth's failure to offer policy limits before resolution of the question whether Frankenmuth was subject to any liability.

[28] The court should, in determining Keeley's prospects of attaining in the future additional assets, consider his educational achievement and plans for future education, his skills, present and prospective, and the job opportunities that might be available to him.

I would prefer to direct entry of a judgment declaring that Frankenmuth is *subject to liability* (not that it is liable) for the $600,000 excess plus interest as it accrues, but would not require Frankenmuth to pay any amount in respect to that judgment unless and until and then only to the extent Boone can establish that Keeley is collectable.

As and when Keeley acquires assets, greater income, inheritance, whatever, Boone could seek a declaration requiring Frankenmuth to pay an amount equivalent thereto. The judgment against Frankenmuth would substitute for the judgment against Keeley, so that Keeley's credit would no longer be adversely affected. The burden thus imposed on Boone, the injured person, would be no greater than in any case where there is inadequate insurance—he could only recover to the extent he could find attachable or garnishable assets.

Boone would be better off because he need not actually attach or garnish, and there should be a minimum of judicial proceedings. Such a judgment should not be subject to any statute of limitations. There would be no possibility of bankruptcy discharge of Keeley's debt.

Frankenmuth argued in the Court of Appeals that the evidence did not establish bad faith. The Court of Appeals agreed with Frankenmuth on other grounds and did not reach that issue. The majority did not reach that issue.

When we reverse the Court of Appeals and it failed to reach alternative issues raised in that Court by the appellee in this Court, we invariably remand to the Court of Appeals so that it can consider the alternative issues advanced by the litigant who prevailed in the Court of Appeals but lost in this Court except in those cases where we address the alternative issues.[29]

The majority should add such a direction for remand to the Court of Appeals to consider issue(s) raised in but not addressed by that Court.

On remand, Frankenmuth would have the opportunity to argue that there is inadequate evidence to support, and it would have been clear error to find, the factual hypothesis for reversal advanced by the majority that Frankenmuth "flagrantly neglect[ed]" the interest of its insured and was guilty of "deliberate bad faith"[30] in failing to offer policy limits before it did.

V

In a separate opinion, one of the justices comprising the majority appears to distance herself somewhat from the result, stating:

I read Justice ARCHER's majority opinion as addressing only the question of the proper mea-

[29] On occasion, the need for remand has been overlooked and when this has been called to our attention by petition for rehearing we have invariably granted that relief.

The question whether alternative issues were properly raised in the Court of Appeals would be for the Court of Appeals to decide since we declined to grant leave to appeal on those issues.

[30] *Ante,* p 541.

sure of damages recoverable once a claim of bad-faith failure to settle has been established. The opinion does not, as I understand it, pass upon the propriety of the trial court's finding in this case of bad faith on defendant's part, nor on the propriety of the Court of Appeals affirmance of that finding. Its failure to do so is the necessary result of our limited grant order in this case, which directed the parties to address only the question whether the trial court and the Court of Appeals properly limited the nature and amount of damages available to Charles Keeley as counterplaintiff in this case. 430 Mich 857 (1988).

Thus, in my view the opinion should not be seen as establishing a new definition or standard of bad faith in such cases, nor, for that matter, as applying an existing definition or standard of bad faith. See, e.g., *Commercial Union Ins Co v Liberty Mutual Ins Co,* 426 Mich 127; 393 NW2d 161 (1986); *City of Wakefield v Globe Indemnity Co,* 246 Mich 645; 225 NW 643 (1929). The question whether bad faith was properly shown under these circumstances is simply not before this Court. [*Ante,* pp 544-545.]

The foregoing statement underscores our concern that there may have been clear error in finding, if the judge did find, bad faith or inadequate evidentiary support for such a finding or for entry of a judgment exceeding $600,000 against Frankenmuth.

In stating "that the trial court did make a finding of bad faith in this case,"[31] the concurring justice opines respecting the issue which she acknowledges "is simply not before this Court."[32] The further statement that the remand ordered by the Court of Appeals implied that the Court of Appeals considered and rejected Frankenmuth's "argument on appeal that bad faith had not been

[31] *Ante,* p 545, n 1.
[32] *Ante,* p 545.

established"[33] assumes that the Court of Appeals considered this issue although the opinion of the Court of Appeals contains nary a word indicating that it did in fact consider the issue. Absent any statement or even allusion in the opinion of the Court of Appeals indicating that it did consider the issue, it appears that the Court of Appeals failed to focus on the need to consider this issue.

The conclusion, on the basis of implication, that the Court of Appeals considered and rejected, albeit without a word, the sufficiency of the evidence/clear error in fact-finding issues suggests at least that its treatment of these issues was cursory.[34] On that basis, also, the majority should remand for plenary consideration of these issues, especially in light of the reservation regarding the sufficiency of the evidence/clear error in fact-finding issues suggested in the quoted two paragraphs of the concurring opinion.

BRICKLEY and GRIFFIN, JJ., concurred with LEVIN, J.

### APPENDIX

The following is the text of the unpublished
_____

[33] *Ante,* p 545, n 1.

[34] The dispositive language in the unpublished opinion of the Court of Appeals is the best evidence that this Court should not indulge a "presumption" that the Court of Appeals "resolved for itself the question whether bad faith was properly shown." (*Ante,* p 545, n 1.) The text of so much of the opinion of the Court of Appeals as discusses the issues dealt with in that opinion is attached as an appendix.

The opinion of the Court of Appeals, and the failure of the majority to follow the procedure this Court invariably follows when there are alternative issues not clearly addressed by the Court of Appeals, indicates that Frankenmuth "undeniably lost" its challenge to "the merits of plaintiff's bad-faith claim" (*ante,* p 545, n 2), not in the Court of Appeals, but in this Court, although the Court of Appeals did not reach and "we did not grant leave to appeal" concerning that issue. *Id.*

opinion of the Court of Appeals in the instant case, except so much of the opinion as states the facts and history of the proceedings preceding reference to the trial court's decision on the bad-faith claim:

Before: E. A. WEAVER, P.J., M. J. KELLY and J. R. KIRWAN, JJ.*

PER CURIAM.

*  *  *

The trial court granted in part Frankenmuth's motion for summary disposition on the counterclaims. However, the trial court found that Frankenmuth was guilty of bad faith in its handling of the claim, and awarded judgment in the amount of $4,152 plus interest, on Wilma Keeley's claim for attorney fees. Appellants now appeal the dismissal of the counterclaim.

Appellants' first issue on appeal is that the trial court erred in applying the rule of *Stockdale v Jamison,* 416 Mich 217; 330 NW2d 389 (1982), in measuring damages. In *Stockdale* the Supreme Court applied contract principles and held that an insurer's liability is limited to the damages suffered by the insured as a result of the breach and, like any other party who fails to perform its contractual obligations, an insurer who breaches its duty to defend becomes liable for all foreseeable damages flowing from the breach. *Id.* at 224. However, "[O]rdinarily an insurer's liability for breach of its contractual duty to defend its insured is limited to an amount equal to the insured's assets not exempt from legal process." *Id.* at 228.

In his counterclaim Charles Keeley sought damages (based on the bad-faith conduct of Frankenmuth in failing to settle), to the extent of the judgment entered against him, despite the fact that in his answer to interrogatories Charles Keeley admitted that his total assets were less than $5,000. On appeal he argues that *Stockdale* was a duty to defend case and therefore does not apply

---

* Circuit judge, sitting on the Court of Appeals by assignment.

to a bad-faith failure to settle claim. Furthermore, it is appellants' contention that *Stockdale* was a contract action rather than a tort action based on bad faith, the present situation, making application of *Stockdale*'s damage limitation inappropriate.

Appellants cite *Sederholm v Michigan Mutual Ins Co,* 142 Mich App 372; 370 NW2d 357 (1985), lv den 424 Mich 857 (1985), and concede that it presents an analogous situation, but contend that *Sederholm* did not give sufficient weight to the fact that *Stockdale* involved a breach of contract case rather than a tort action based upon the bad-faith conduct of the insurer. We decline to accept appellants' argument.

*Sederholm,* which involved a situation similar to that presented here, extended the *Stockdale* measure of damages to situations where, like here, the insurer acted in bad faith in failing to settle. Relying on footnote 15 in *Stockdale* the *Sederholm* Court stated:

"Based upon the clear language of footnote 15, it is apparent to us that the majority approved and accepted Professor Keeton's recommendation of damages in actions for breach of duty to settle, and the only question remaining was whether the rule should be extended to 'failure to defend' situations. Accordingly, we hold that the trial court erred in refusing to apply the *Stockdale* measure of damages to count II of plaintiffs' complaint." *Sederholm, supra* at 398.

In *Stockdale,* where the measure of damages for an insurer's breach of its duty to defend was limited to the insured's assets not exempt from legal process, the Supreme Court relied on the following rationale:

"Professor Keeton has suggested that this is an appropriate measure of damages for an insurer's breach of its duty to settle. Keeton [Insurance Law, § 7.8(b), p 510], § 7.8(f), p 516. As Professor Keeton points out, this approach has the advantage to both parties of eliminating the need for the insured (and consequently, the plaintiff) to suffer

the costs of a bankruptcy proceeding in order to establish the actual amount of loss." [*Stockdale, supra* at 228, n 15.]

The *Sederholm* Court reasoned that if the Supreme Court can extrapolate from Professor Keeton's treatise a limitation on the measure of damages in a breach of a duty to defend case to those assets of the assignor not exempt from legal process, then the stated proposition in Professor Keeton's treatise, that the measure of damages in a breach of a duty to settle is limited to the assets of the assignor not exempt from legal process, is also appropriate. We agree.

However, like *Stockdale, Sederholm* and *Maynard v Sauseda (On Remand),* 130 Mich App 445; 343 NW2d 590 (1983), this case should be remanded for a determination of the extent of the assets of Charles Keeley not exempt from legal process, with the trial court entering judgment against Frankenmuth in an amount equal to Charles Keeley's assets not exempt from legal process.

Appellants also argue that the trial court erred in computing post and prejudgment interest. Appellants argue that Frankenmuth should have been required to pay interest on the entire tort action judgment from the time of the complaint until the policy limits were tendered and that since Frankenmuth failed to do this, it should be liable for postjudgment interest until the deficiency is satisfied. This claim is without merit. This Court has repeatedly rejected attempts to hold an insurer liable for prejudgment interest on judgment amounts which exceed the liability policy limit. See *Bent v Bostwick,* 148 Mich App 184; 384 NW2d 124 (1986); *Matich v Modern Research Corp,* 146 Mich App 813; 381 NW2d 834 (1985), lv gtd 425 Mich 871 (1986); *Sederholm, supra; Celina Mutual Ins Co v Citizens Ins Co of America,* 133 Mich App 655; 349 NW2d 547 (1984).

Appellants also argue that the trial court erred in ruling that damages for emotional and mental strain were not recoverable. Appellants contend

that Frankenmuth's bad-faith failure to settle will support a claim for damages based on emotional and mental strain.

Appellants' claim is without merit. "[A]n allegation of bad-faith breach of an insurance contract does not support recovery of damages for mental distress in Michigan. There must be a finding of tortious conduct independent of the contractual breach to justify the award of mental distress damages." *Crossley v Allstate Ins Co,* 155 Mich App 694, 698; 400 NW2d 625 (1986).

Error is also claimed in the award of attorney fees to Wilma Keeley. Wilma Keeley originally requested $13,344.92 in attorney fees. The trial court ultimately awarded $4,152 holding that the expenses incurred by Keeley in the declaratory action were not chargeable to the insurance company. Since the rule in Michigan is that it is improper to award attorney fees for a declaratory action to enforce insurance coverage, the trial court did not err in limiting its award here. *Schiebout v Citizens Ins Co,* 140 Mich App 804, 814; 366 NW2d 45 (1985), aff'd 427 Mich 602 [398 NW2d 411] (1986); *Shepard Marine v Maryland Casualty Co,* 73 Mich App 62, 66; 250 NW2d 541 (1976); *City Poultry & Egg Co v Hawkeye Casualty Co,* 297 Mich 509; 298 NW 114 (1941).

The decision of the trial court is affirmed in part and the matter is remanded for proceedings consistent herewith.